## FRIEDRICHSEN v. GUARANTY TRUST CO. OF NEW YORK et al.*
### Nos. 5936, 5937.

Circuit Court of Appeals, Ninth Circuit.
April 7, 1930.

Ernest C. Griffith, Haight, Mathes & Sheppard, and James C. Sheppard, all of Los Angeles, Cal., for appellant.

Ayres, Gardiner & Pike and W. M. Gardiner, all of Reno, Nev., and Davis, Polk, Wardwell, Gardiner & Reed and T. O. Fitz-Gibbon, all of New York City, for appellee complainant.

Cooke, Stoddard & Hatton, of Tonopah, Nev., and H. R. Cooke, of Reno, Nev., for appellee Cole.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

Two appeals were taken by the intervener, one from a decree of foreclosure and another from an order confirming a sale made in pursuance of the foreclosure of certain mining property situate in the state of Nevada. It is admitted that the Tonopah Extension Mining Company, which will hereafter be referred to as the mining company, defaulted in an installment of the interest due upon the mortgage in January, 1928. This default was agreed upon at a meeting of the board of directors held in New York City on October 22, 1927. Five directors were present and two stockholders, Leopold Adler and T. F. Cole. The parties represented at the meeting owned $151,000 of the bond issue, and a large amount of stock in the corporation. They were called together to meet the crisis in the affairs of the mining company due to the exhaustion of its funds and the high cost of operation. It is admitted that at the time of the default on January 1, 1928, the corporation had sufficient funds to pay the installment of interest then due. But it did not have sufficient funds in hand or in prospect to operate the mine until the next installment of interest was due on the mortgage in July, 1928.

When the mortgage foreclosure was instituted for default in the payment of the installment of interest due in January, 1928, thus accelerating the due date of the entire mortgage, the mining company, by its answer, admitted the default, consented to a decree of foreclosure, and stipulated for the appointment of a receiver to operate the property during the pendency of the litigation. Thereafter the intervener, owning 409

*Rehearing denied May 26, 1930.

shares of the preferred stock and 1,000 shares of the common stock, a relatively small part of the capital stock of the corporation which had 1,478,000 shares of common stock and over 299,147 shares of preferred issued, petitioned the court for leave to intervene on behalf of the corporation upon the theory that the corporate rights were not being protected by the directors, who, it was alleged, were acting in fraud of the rights of the stockholders. He alleged that the making of the mortgage itself and the default thereon were made and committed to effectuate a preconceived plan of acquiring the ownership of the mining property at the expense of the holders of the stock of the corporation. The charge that the directors of the mining company owning bonds secured by the mortgage of the entire property of the mining company permitted default upon the mortgage in order to accelerate the due date, and thus, by prompt foreclosure, cut off the rights of the stockholders and secure to themselves, as bondholders, an interest in the property commensurate with their holding of funds, is one which requires examination and explanation. In this connection it should also be stated that the intervener claims that the stockholders were not given an opportunity to subscribe for the bonds of the corporation at the time they were offered, and that this also was in furtherance of the plan to secure title to the property of the mining company. In order to understand the situation, it will be necessary to make a somewhat detailed statement concerning the affairs of the mining company.

The mining company for more than twenty years has successfully operated the mine. It had produced bullion worth $21,000,000, and, after paying the large expense of operation, had paid the stockholders over $4,-000,000 in dividends, which was about two and one-half times the face value of the stock issued. The mine had reached a depth of over 2,375 feet, and drifts were run on various levels. The mine had practically been worked out above the 1,500 foot level. All rich ore bodies immediately available had been worked out in 1925, and the directors were then confronted with the problem of taking care of the expense of pumping the mine and of doing further development work in the hope of finding other ore bodies and developing those already known. In order to raise the money for this work, an issue of 700,000 shares of preferred stock had been offered to the stockholders. There was very inadequate response from the 3,500 stockholders of the company, and for that reason

much of the stock sold was subscribed and paid for by the men who subsequently purchased the bonds secured by the mortgage in suit. Developments continued with the money thus received by the corporation until the fall of 1926, when it was apparent that more money would be needed in order to continue the development work essential to the discovery and exploitation of new ore bodies. Some of the directors and larger stockholders were inclined to abandon the enterprise, but the manager of the mine refused to consent to the abandonment of the enterprise, and expressed the opinion that for an expenditure of $180,000 he could run a drift to a body of ore which had been theretofore discovered in a shaft on another level, and that thereafter the property could be successfully and profitably operated. In view of this assurance, the directors agreed to execute a mortgage and float a bond issue and individually to subscribe for a part of that issue to raise this money. This was done. The stockholders were circularized in an effort to get them to subscribe for the bonds. The intervener claims that this effort was a mere subterfuge, and that those stockholders who desired bonds were informed that the whole issue had been subscribed. The amount of bonds requested by one stockholder was $5,-000. He was given $500 of bonds, and informed that the balance had been subscribed for.

The trial court finds, and the evidence justifies the conclusion, that the bond issue was made in good faith. The money derived from the sale of bonds was expended in the further development of the mine as planned to reach the known ore body. In this connection it should be stated that, although the cost of pumping water from the mine, if no other work were done, would have quickly exhausted the fund, the losses were reduced by the ore produced, by the exploration, and by the operation of the mine. The predictions of the manager as to the cost of the drift to the ore body which it was desired to work were fully justified, and at the time and with the expense anticipated the ore body was struck by the drift. In passing through the vein, however, it was found that it had faulted, and, instead of having some 350 feet of the vein above the drift, the drift had landed on top of the vein with only 12 feet of ore above the drift. The ore body was richer than had been anticipated, but, owing to water conditions, it could not be taken out from the drift just completed, and it would be necessary to drive another drift for that purpose at a still lower level, in order to mine

the ore, thus requiring an expenditure of still more money. It was in this situation that the directors met and agreed to default on the next installment of interest due January 1, 1927, and agreed to the appointment of a receiver, when the action was commenced, and Mr. Cole, one of the stockholders owning $86,200 of the bonds, agreed to purchase the receivership certificates necessary to run the mine during foreclosure on behalf of himself and such bondholders as would join with him in so doing. The trial court held that this agreement was made in good faith, and, under the circumstances, was for the best interest of the corporation. In considering the question of the good faith of the directors of the corporation, it should be stated that the major problem of the mining operations was the removal of the large amount of water constantly making in the mine. It was necessary at one time to lift about 2,000 gallons of water per minute from a depth of 1,900 feet, and during the receivership the receiver was pumping 1,800 gallons of water per minute against an average head of 1,900 feet. The receiver testified that, if pumping discontinued for a few hours, the pumps and lower workings of the mine would be flooded; that, if the pumping were discontinued for twenty-four hours, the mine would be flooded, and it would be impossible to get back to lower levels because of cave-ins which would ruin the mine. The mine above the 1,500-foot level was practically worked out. It was estimated by the receiver that the expense of pumping and preserving the mine, if no other work was done, would be over $38,000 per month, and that, if operated, the mine would lose about $25,000 a month for six months more from the date of the trial in September, 1928. It is conceded that, if pumping operations stopped, the mine would be completely ruined.

After 1925 the directors were at all times faced with the problem of putting into the mine about $1,000 a day and every day continuously in order to prevent a total loss of the property, and that in a mine having merely a speculative value based upon the hope of discovering new ore bodies and developing such ore bodies known or discovered. The result of the agreement of October, 1927, has been that the stockholders have profited by the money derived from the sale of receivership certificates, which has been expended in the operation of the mine over and above the proceeds from the mine. This money was advanced by Mr. Cole in pursuance of his agreement with the directors of the mining company so to do. The manager of the mine was appointed receiver. The mine was operated at a loss from May, 1927, to December, 1927, of $108,871.42, before the receivership, and at a further loss for the first seven months of 1928 of $141,198.35, a total loss of $250,069.-77, and it was estimated that a further loss of $150,000 would be suffered before the mine could be placed on a paying basis. The mining company has thus had the advantage of the expenditure of the money derived from the sale of the preferred stock of which the intervener took 409 shares, and then the amount derived from the sale of the bonds, and then of the amount derived from the receiver's certificate of about $250,000 in the effort to preserve and develop the mining properties.

At the time the court rendered its decree the conclusions of the court as to the facts were stated orally, and for a further statement of the facts we quote in part as follows:

"The Court will at this time state that the allegations of the amended and supplemental complaint in intervention charging fraud as a conspiracy upon the part of certain of the directors of the Tonopah Extension Mining Company, together with Thomas F. Cole, to, in effect, accomplish the failure of the directors of the corporation to pay the interest due upon the bonds in January, 1928, in order that the default may thereby occur and the suit in foreclosure be brought, so that the property could be acquired by certain bond holders in fraud of the rights of stockholders, are not supported by the evidence. In this case it does appear that the corporation was in possession of funds sufficient to pay the interest due at that time. It does not, however, follow that because that interest was not then paid, the directors and officers of the defendant corporation were not acting in accordance with their duties as such directors and officers, and to the best interests of the company, its creditors and stockholders. The evidence shows that at that time the money available as resources of the company together with the proceeds of the mine were insufficient to have kept the mine in operation until the next semi-annual interest payment on the bonds would become due. It also appears in evidence that unless the defendant was provided with funds to maintain pumping operations the mine would eventually be flooded, and its value as a future mining property largely, if not entirely, destroyed.

"The evidence also shows that prior to the time of default in the payment of interest on

the bonds, a tentative plan for the purchase of the property upon foreclosure sale had been devised, by which Thomas F. Cole, representing the bondholders, would undertake the purchase of the property at such sale. There is nothing in this plan of procedure, in view of the facts established in this case, which indicates any fraud upon the part of the officers. In this case it must be comprehended that we are dealing with a precious metal mine, and not the ordinary commercial or industrial enterprise. The evidence shows that upon two preceding occasions after the known profitable ore bodies of the mine had been exhausted, the directors of the company had resorted to methods of raising additional funds for exploration and development work, one of which comprehended the sale of preferred stock, another the issuance of bonds. Both the preferred stock and bonds were offered to all of the stockholders of the company. Only a small portion of the securities was taken by the large body of stockholders, which the record shows was in number about three thousand five hundred. The evidence shows at this time that the defendant corporation is, and has been for many months, not operating at a profit. Whether or not it will ever so operate depends entirely upon the outcome of the development work now being carried on by the receiver appointed by this court. The several parties who have undertaken to finance these operations are not shown to be acting in any fraudulent conspiracy. There is no evidence in the case which would justify any conclusion of fraud. So far as the evidence appears, it is to the mind of the Court conclusive to the contrary."

The trial judge at the time of the order confirming the sale from which one of the appeals now under consideration was taken again stated his view concerning the property as follows:

"In considering all of the various questions that have been presented upon the foreclosure suit and the receivership, I want, in conclusion, to emphasize what was briefly stated in the memorandum opinion heretofore filed; that in this case we are dealing with a precious metal mine, not with an ordinary industry. Courts of this state will take judicial knowledge of the conditions generally surrounding the mining industry, and particularly that of the precious metal mines, and of the history of this state with respect to such mines. I think there has been no stage of the proceedings here in which the Court would not have been justified in dismissing entirely the petition in intervention. The only question which the Court has considered of serious importance is that in connection with the original failure of the directors of the corporation to pay the interest accruing on the bonds, when it may be said technically, the company was in position so to pay. That might in the case of any other industry, be a sufficient ground for a stockholder to make an attack upon the procedure; that this is the case of a mining company where the funds were limited, where the profitable ore bodies were exhausted, where the mine was in the condition, such as, in the common parlance of mining, it was a gamble as to whether future ore bodies would be discovered so that the mine could be restored to a profitable operating institution. As I have said before, the history of mining in this state shows, I think I may safely say, that in the great majority of cases such gambles have been not profitable to the persons taking the chance. In this case it is shown that had not the course pursued been taken, in all probability money to carry on the operations could not have been procured from any other source; that the mine in that event, would in a short time be flooded, and then the probability of its ever being reopened would be lost. Even with the large expenditures which have been advanced by Mr. Cole, it must be said, at least up to the present time, they are largely a gamble that the views of Mr. Kirchen and other engineers, will be borne out by development work. Ore bodies may be found of the size and in the place that in the opinion of the engineers they will be found. That may occur, and even then the values found to be of such a grade that the mine will not be successfully operated. That has occurred many times in the history of mining. We are hopeful in this case that the work carried on may be a success. If it is a success, in my judgment, and that is based on that I think this court may take from almost judicial knowledge of the history of mining, that even then it is the only hope of the stockholders."

The only hope for the stockholders at the time the court was considering the question of whether or not a sale of the mine should be ordered without the right to redeem was in the discovery of new and rich ore bodies. Mr. Cole, who subsequently bought the property, testified as follows concerning the situation at that time (January 18, 1929):

"I believe it is a great property but it means money; it means brains; it means a tremendous task to rehabilitate it still, even though the work so far done has disclosed ore in approximately the position in which it was expected to be found. Because of the fact

that we are limited in our development work and to spending money to reach known ore bodies, we want to get it from the hands of the Receiver in order to be in position to extend our development beyond that point, and to get into other mineralized areas.

"In my judgment it would be necessary for a purchaser, or myself if I bid in the property and pay off the $650,000.00 total accrued expenses involved in this proceeding, claims, etc., to have available for use in equipping the property for continued operations, nearly $300,000.00. That would not cover the new shaft. We hope to locate and sink that new opening and equip it from earnings to be made later on. * * *

"If the receivership continues I would not continue to take receiver's certificates unless I had a free rein in the development of the property, and not be handicapped as we now are.

"With respect to my willingness to bid approximately $650,000 for the property, I would not want to make a bid of any substantial sum in the event the equipment were sold and removed from it. My willingness to bid the property in means to take the entire property just as it is now, as a going concern, nor would I make a bid for any substantial sum should the property be subject to redemption later."

Later he says: " * * * When I assented to become interested in the rehabilitation of this property, I realized that it might take sums beyond, say the six hundred or $650,000.00 of which we now have knowledge. Therefore I insisted at the time that at least the new company should have a bond issue up to $1,200,000 and those bonds should be available to be sold, any portion of them, that would not be exchanged for old bonds, or for any indebtedness of the company, to be used by sale to further conduct work until the development had arrived at a point sufficient to show some earnings."

In commenting upon this testimony, the court, after stating that it would take judicial notice of the financial hazard in the investment of a vast sum of money in developing the mine which was not paying, said:

"The Court would be more impressed if there was some showing by the stockholders during the progress of this proceeding that they were willing to come forward and offer some money or some assistance towards the carrying on of the enterprise. So far nothing of that kind has been brought to the attention of the Court. I want to make myself thoroughly clear in connection with the stockholders. The Court is impressed that in any case the rights of the stockholders ought to be protected, just as far as a court can possibly go. I think we can almost take judicial knowledge of the fact that it is almost impossible in cases of this kind to get substantial co-operation from stockholders among themselves."

It is not contended by the appellant that the mine has not been developed at all times in good faith, or that the moneys derived from the sale of the bonds and the sale of the receivership certificates were not expended in good faith for that purpose. It is contended, however, that the court had no authority to authorize the expenditure of money by the receiver for the purposes for which it was used. The expenditure for merely pumping the mine and thus preserving it would have been much greater than was the cost of both pumping and mining. The money used for mining as distinguished from mere pumping was derived from the mining operations. Thus the money obtained by the sale of the receivership certificates was wholly used for the needful preservation of the mine. The right of the court to thus preserve the subject-matter of the litigation, at the request of the bondholders, and of the directors of the corporation, cannot well be questioned by a stockholder seeking to intervene on behalf of the corporation, who offers no other solution of the problem presented by the waters threatening to destroy the mine.

In considering the appeal from both the order of foreclosure and that from the order confirming the sale thereunder, it is to be remembered that the stockholder who seeks to establish the rights of the corporation by his active intervention must on its behalf offer to do equity as a condition of invoking the power of a court of equity to displace the duly constituted officers of the corporation. In the petition for intervention, the stockholder is an actor in a court of equity, and he must offer to do the equity which he demands from others. As the substance of his complaint in the first instance is that the directors have permitted a default in the payment of interest due upon the bonds, this complaint is based upon the theory that such an act under the mortgage resulted in the acceleration of the due date of the principal, and that the directors should have paid the amount due and thus have deferred the maturity of the principal until the date of maturity agreed upon in the bonds. By this contention the intervener assumes the validity of the mortgage, and in that event it was necessary for

the intervener to do equity, and that he should at least offer to pay the interest then due upon the bonds in order to be relieved from the acceleration of the principal of the bonds due to its nonpayment, or should offer to have the corporation pay the same. In default of such a payment, after a reasonable opportunity afforded the corporation to pay the same, it was proper for the court to order the sale of sufficient of the property of the corporation to pay the whole amount of the bonds, for it is to be observed that, where a foreclosure is necessary to secure payment of an overdue installment of interest, after a reasonable opportunity to pay it, the court may properly order the sale of the entire property mortgaged, the proceeds of the sale, above the amount due, to be impounded by the court to pay the interest and principal as it matures. Howell v. Western R. Co., 94 U. S. 463, 24 L. Ed. 254. On the other hand, the intervener attacks the validity of the mortgage on the ground that it was executed in furtherance of a plan to defraud the corporation. The money derived by the mining company from the sale of the bonds has been all used by the company; therefore equity would demand as a condition of invalidating and setting aside the mortgage for fraud that the money loaned on the faith of its provisions be returned. In the absence of such repayment or tender, the offer of the stockholder on behalf of the corporation to do or have equity done by the corporation to the bondholders who advanced this money would require the sale of the corporate property to pay the indebtedness secured by the mortgage if no other provision for such payment was made or offered. Therefore the offer to do equity, as a condition of invalidating the mortgage, was in effect a consent to a sale of the property to pay the entire mortgage debt in default of other arrangements to do so. To repeat, the intervener acting for the corporation must either tender or pay, or offer to have the corporation pay, the interest installment due January 1, 1928, as a condition of avoiding the acceleration of the principal of the mortgage, and may in that case stand upon the terms of the mortgage and bonds which fix the time for the return of the borrowed money, or must as a condition of avoiding the mortgage and the bonds for fraud pay or tender the amount loaned thereon, or offer on behalf of the corporation to have the property thereof, so far as needed, applied to the debt which, in the event of the invalidating of the mortgage, equitably becomes at once due and payable.

In either aspect of the case, the decree appealed from and the order of confirmation of the sale thereunder thus did no more than equity required of the intervener even if he had sustained his allegations of fraud. Having failed to establish fraud in the execution of the mortgage, he cannot avoid the effect of the failure of the directors to pay an installment of interest due on the mortgage without doing equity to the bondholders. No tender has been made by the intervener of this money or any part of it, no plan has been advanced by which bondholders could be repaid, and no effort has been made to meet the obligations growing out of the expenditures by the receiver which were necessary to preserve the property during the litigation. The mine has been operated for almost a year by the court, acting through its receiver. During that period the only contribution made by the intervener has been by way of objections during the whole proceeding. If the 3,500 stockholders appellant claims to represent were as much interested in the success of the mine as those who have advanced money to the mining company to preserve and develop its mine after it ceased to be paying property, they have had as ample opportunity to do so as those who have made the expenditure. No reason is suggested why they could not have purchased the property at the time of sale, whereas it was allowed to be bought in by Mr. Cole, as he had testified he would do. It is true the amounts involved are large, but that fact does not excuse the stockholder, who is seeking intervention of equity for his protection, from accepting the burden which is justly his and from dealing equitably with those from whom he seeks fair dealing. The mortgage contained an agreement to operate the property continuously and keep it free from water. The intervener cannot justly demand that all operations for the preservation of the property should cease, for that would mean, not only a total loss to the bondholders, but also to all the stockholders, but also would be a breach of the terms of the mortgage which, we agree with the trial court, was executed in good faith. By such a position the intervener would not show himself more fit to look after the interests of the corporation than the directors who have arranged to finance it, as he claims, not only in its preliminary difficulties, but also during the litigation, and until it could be sold as a going concern. In theory, at least, the foreclosure sale should preserve to the stockholders their equity in the property, if any there was, over

and above the mortgage and expenses in the increased purchase price received upon the sale.

■ The trial court, after hearing evidence as to the proper method of sale of the property, came to the conclusion that, unless the property was sold as a unit and without the right of redemption, it would not or might not pay the expenses of the receivership, including the receiver's certificate. The plaintiff corporation, the trustee named in the mortgage, and the defendant mining company, agreed to the order directing the sale without the right of redemption. This agreement followed the terms of the mortgage which so provided. The period of redemption under the Nevada law for real estate sold in pursuance of a mortgage foreclosure is six months, and it is estimated that the net cost of protecting the property during that period, without further mining or development work, would be over $180,000. The proposed bidder, Mr. Cole, testified, as above stated, that he would not bid on the property if it was sold with a right of redemption, nor bid upon it if the personal and real property were separated. It has been held that sales of similar personal and real property covered by a single mortgage could be so made regardless of the state statute permitting redemption. National Foundry, etc., Co. v. Oconto Water Co. (C. C.) 52 F. 43; Cont. & C. T. & S. Bank v. Corey Bros. Const. Co. (C. C. A.) 208 F. 976, 984; Pac. N. W. Pkg. Co. v. Allen (C. C. A.) 116 F. 312; Title Ins. & Trust Co. v. Calif. Dev. Co., 171 Cal. 173, 152 P. 542, 555; Fletcher on Corporations, vol. 3, p. 2372, § 1388. It is claimed that these cases are peculiarly applicable to mining property in Nevada where such mining is declared to be a public use. Stat. Nev. 1887, p. 102, Revised Laws of Nevada, § 2456. Whether such a sale could be so made without the consent of the mining company is a point we need not determine, for the reason that we here have that consent expressed both before and after the order, and the only question necessary for our determination is whether the intervener can successfully invoke the power of the court to overturn the determination of the board of directors and of the counsel representing the corporation by invoking the court's authority to protect the corporation, notwithstanding the action of the corporation through its duly appointed officers. Instead of that, the court, after fully hearing all parties, including the intervener, approved the action of the directors and ordered the sale without redemption as agreed by the directors of the corporation. The court therefore had announced its conclusion that the basis on which the intervener sought to invoke the powers of the court was not well founded, but nevertheless did give full opportunity to the intervener to be heard as to the advisability of such a sale, and decided that equity and justice required the property to be so sold. The intervener made no claim that he would bid, or that any other bid than that of Cole could be reasonably anticipated. He was asking a court of equity to adopt a course which would wreck the mining property, destroy the security of the bondholders, and leave them without adequate remedy, and ignore the obligations of the receiver by a course of action that might result in a total loss to all concerned. The court was fully justified in acting upon the consent of the corporation and in ignoring or overruling the intervener's opposition to such a sale. The fact is, as the sale demonstrated, that the mine is worthless except as a speculation, and that no one was willing to speculate upon the property other than those who were already so deeply involved that it was necessary for them to go forward in an effort to protect themselves in the expenditures already made.

The decree and order are affirmed.

Judge RUDKIN sat in the hearing of this case, but does not participate in the decision.