## NEVADA CONSOL. COPPER CO. v. CONSOLIDATED COPPERMINES CORPORATION.

### No. 157.

District Court, D. Nevada.
Aug. 8, 1930.

Chandler & Quayle, of San Francisco, Cal., Chadbourne, Stanchfield & Levy, of New York City, Wm. E. Colby, of San Francisco, Cal., and William Wallace, Jr., of New York City, for plaintiff.

Brown & Belford, of Reno, Nev., Joseph B. Cotton, of New York City, John P. Gray, of Cœur d'Alene, Idaho, and Roy F. Wrigley, of New York City, for defendant.

NORCROSS, District Judge.

This is an action in equity primarily to enjoin the defendant from prosecuting certain mining operations in plaintiff's Champion and Liberty mining claims. Defendant asserts the right to so mine by virtue of the provisions of a contract of date June 16, 1926.

The main question in controversy is the meaning of the language in article IV of said contract: "It is agreed * * * that all of the ore in the Champion and Liberty claims * * * extending westerly from a vertical plane * * * shall be mined by the Coppermines Company. * * *"

Plaintiff and defendant and their predecessors in interest for many years have been engaged in mining in Robinson mining district, White Pine county, Nev. Since about the year 1907, plaintiff has been continuously engaged in mining by steam shovel methods in a group of its claims known as the Copper Flat group. In the course of its operations, plaintiff excavated two shovel mine pits. About the year 1917 these two pits were consolidated and thereafter known as the Liberty pit. The Liberty pit has been excavated to a depth of several hundred feet beneath the original surface, for a length in an easterly and westerly direction of about a mile, and for a width of about half a mile.

Defendant is the owner of a contiguous group of mining claims. In the main, defendant's said claims are situate westerly and northerly of the westerly end of said Liberty pit. Defendant's Ora, Emma Nevada, and Westphalia claims are so located that they extend beyond the perimeter and into the pit. Two of plaintiff's claims, the Champion and Liberty, are partially within the pit area, but extend westerly beyond its perimeter.

The ore in the Liberty pit is characterized as a disseminated porphyry, and is mined for its copper, gold, and silver content. The ore body has been proven to extend westerly beyond the Liberty pit into the adjoining group of claims of defendant.

Plaintiff operates a smelter and ore reduction plant of approximately 20,000 tons' daily capacity at McGill, about twenty miles distant from the Liberty pit. Plaintiff is also the owner of the capital stock of Nevada Northern Railroad, which supplies the dis-

trict with railroad facilities, and which connects with the Southern Pacific and Western Pacific lines. Plaintiff also supplies certain electric power to other operators in the district.

Prior to the execution of said contract, plaintiff and defendant in certain of their mining operations were proceeding under various contracts or agreements. The contract was intended to govern certain of the mining operations of the two companies, particularly mining by each in the property of the other and for the account of the other, covering a period of twenty years.

The evidence establishes without conflict that, if defendant's interpretation of the contract is correct, and defendant carries out its proposed plans for the extraction of ore by underground methods in plaintiff's Champion and Liberty claims at and west of what is known as the contract plane within the pit area, it will destroy the westerly end of said Liberty pit and materially reduce mining by steam shovel methods therein.

Throughout the contract plaintiff is referred to as Nevada Company and defendant as Coppermines Company. So much of the contract as is material to a determination of the issues presented or is of aid in construing the provisions of article IV thereof reads:

"Whereas, the Nevada Company is the owner of certain mines and mining claims * * * and has been and is engaged in mining * * * by the use of steam and other power shovels, * * * and in the course of its operations has excavated thereon a large open pit, known as the Liberty Pit, and now proposes to complete its open pit mining operations thereat as soon as practicable, and meanwhile and thereafter purposes to begin underground mining in said pit and in territory in the vicinity thereof; and

"Whereas, the Coppermines Company is the owner of certain mines and mining claims * * *, all of which mining claims in this recital are adjacent to or in the immediate vicinity of said Liberty Pit; and * * *

"Whereas, * * * the property of neither party * * * can be worked to full advantage without working the property of the other party; * * *

"Now, therefore, it is hereby agreed: * * *

"Article I. For all the purposes of this agreement, said Ora, Emma Nevada, Watson and Herstelle claims, and all those portions of * * * claims lying easterly of a line drawn * * * shall be included in and as

a part of the mining operations embraced in this agreement. * * *

"Article II. The Nevada Company shall with reasonable despatch * * * as a part of its Liberty Pit shovel operations commence the mining of ore from the said Ora and Emma Nevada claims. * * *

"It is estimated by the Coppermines Company that in the Ora and Emma Nevada claims there are now * * * corresponding to the tenth level of said Liberty Pit operations, approximately eight hundred fifty thousand (850,000) tons of open pit merchantable ore belonging to the Coppermines Company. * * *

"If the Nevada Company shall continue its steam or other power shovel mining below said tenth level of the Liberty Pit it agrees that it will continue so to mine and remove, * * * any additional merchantable ores in said Ora and Emma Nevada claims, below said level. * * *

"Article III. All ores * * * from the Ora and Emma Nevada claims * * * occurring below approximately the tenth level of the Liberty Pit operations or below whatever level to which the Nevada Company shall carry its shovel Liberty Pit operations shall be mined by underground methods, and the Nevada Company hereby agrees to mine underground such ore * * * for the account of the Coppermines Company. * * *

"Article IV. The Coppermines Company hereby agrees that within five years * * * it will sink and equip at least a four-compartment shaft * * * in the vicinity of said Liberty Pit, to a depth of at least six hundred (600) feet and, except as otherwise in this Article provided excluding any ore below elevation sixty-six hundred (6,600) of said Liberty Pit operations, it is agreed by the parties hereto that all of the ore in the Champion and Liberty claims of the Nevada Company extending westerly from a vertical plane coinciding with and passing through a line extending from the northeast corner of the Westphalia claim to the southeast corner of the Emma Nevada claim, estimated by the Nevada Company at five million, three hundred fifty thousand (5,350,000) tons of merchantable ore, together with such boundary ore wherever situate east or easterly and/or west or westerly of said plane as may incidentally be drawn in the ordinary course of mining from drifts and raises which may extend to, but which are not to extend beyond, said plane, shall be mined by the Coppermines Company for the account of the Nevada Company.

"The Coppermines Company shall have the right to stope at said plane or eastwardly up to said plane before the Nevada Company shall stope westerly thereto, provided that the stoping of ore begins within five years from the execution and delivery of this agreement and is continued with reasonable diligence for most economic mining of the boundary ores of both companies. If, after sinking and equipping said shaft, the Coppermines Company shall not be able (by reason of the exhaustion of the ore in this Article above referred to) to mine under this Article the full five million, three hundred fifty thousand (5,350,000) tons of ore in said area, the Coppermines Company shall have the right to mine from claims of the Nevada Company adjacent to the western boundary of said Liberty Pit or elsewhere  *  *  *  such tonnage of ore as the Coppermines Company was unable to mine from said Champion and Liberty claims as, together with the ore mined by the Coppermines Company from said Champion and Liberty claims, will aggregate five million, three hundred fifty thousand (5,350,000) tons of ore; provided, however, that the maximum quantity of ore so to be mined by the Coppermines Company for the account of the Nevada Company shall not exceed five million, three hundred fifty thousand (5,350,000) tons unless more than that quantity shall be found to exist in said Champion and Liberty claims westerly of said vertical plane and inclusive of such ore as may be drawn in in stoping up to said vertical plane, in which event the Coppermines Company shall mine and remove all the ore therein which can be advantageously and economically mined and removed. And provided further that the Coppermines Company shall begin to mine such ore within five years  *  *  *  and shall mine continuously at an average annual rate of not less than three hundred fifty thousand (350,000) tons, but in any event at such rate as will enable said Coppermines Company to complete the mining of the total tonnage specified herein within the life of this instrument. It is the intent hereof that in and by this Article the Nevada Company grants the Coppermines Company the right to mine and remove from the Champion and Liberty claims or other claims adjacent to the Liberty Pit, at least five million, three hundred fifty thousand (5,350,000) tons of merchantable ore within the term hereinbefore specified.  *  *  *

"The Coppermines Company shall give the Nevada Company thirty (30) days written notice whenever it is ready to commence mining operations under this Article and thereupon and seasonably, from time to time, the Nevada Company will give the Coppermines Company directions in writing covering all development work within the mining claims of the Nevada Company which may be necessary to carry on the mining operations required by this Article and the Coppermines Company will do all such development work.  *  *  *

"As to all ore mined agreeably to this Article, the Nevada Company shall pay the Coppermines Company  *  *  *  the actual cost of mining such ore per ton, including the necessary underground development thereof, and usual and normal overhead charges, plus sixteen cents (16¢) per dry ton.  *  *  *

"Article V.  *  *  *  Each party hereto shall conduct its mining operations hereunder, both in respect of its own and as to the other party's properties, in a good, workmanlike manner, and in accordance with the requirements of good engineering practice, and so as not to cause or do or permit any unnecessary or unusual waste or permanent injury or inconvenience or hindrance to the subsequent operation of the properties of the respective parties hereto.  *  *  *"

Article VI. This article deals with the purchase from Coppermines Company by Nevada Company of certain porphyry ores not exceeding 3,000 tons daily, and, in addition thereto, not exceeding 500 tons per day of oxidized direct smelting ores.

Article VII. This article deals with the matter of suspension of mining operations by reason of the low price of copper.

"Article VIII. The Nevada Company agrees that within six months  *  *  *  it will locate and start to sink and equip a main working shaft on its Wedge or other claim which lies adjacent to the Ora claim of the Coppermines Company, for the purposes of development, drainage and mining underground.

"The Coppermines Company shall, without charge,  *  *  *  execute and deliver to the Nevada Company a good and sufficient license  *  *  *  granting the Nevada Company the right  *  *  *  to use so much of the surface of the Ora and Emma Nevada claims  *  *  *  as may be necessary  *  *  *  in and for the mining of up to eight thousand (8,000) tons of ore per day through said Wedge shaft.  *  *  *

"The rights granted by said license shall  *  *  *  cease and determine if and whenever the ores in said Liberty Pit and adjoining property shall be exhausted.  *  *  *"

Articles IX, X, and XI. These articles deal with certain hoisting charges and transportation and treatment.

"Article XII. It is the express understanding of the parties hereto that they shall mutually cooperate as to all questions under this agreement for the purpose of most economically opening up and mining the ore bodies of the properties of both parties. * * *

"It is further agreed * * * that each party hereto shall give the other party surface rights for laying the tracks of each for use of the surface of the other party's ground. * * *

"In furtherance of the foregoing, the Coppermines Company hereby grants, * * * the right to remove at any time * * * from any and all of the mining claims and parts of mining claims specified in Article I hereof, * * * all such overburden as it shall deem necessary to remove in order to enable the Nevada Company to mine by steam or other power shovel any of its ore or any ore of the Coppermines Company in connection with said Liberty Pit operations and to allow for the maintenance of proper working slopes in said Liberty Pit.

"The Coppermines hereby further grants * * * such railroad trackage rights of way * * * in its pit benches over or through any portion of any of the claims or parts of claims covered by Article I hereof and into which said Liberty Pit may be extended by virtue of the operations under this agreement as may be necessary in order to keep the Pit spirals unbroken and continuous and so permit and preserve a practicable method of pit haulage in the current and future direction of the Nevada Company's general Liberty Pit operations. * * * All trackage rights * * * shall be subject expressly to the future mining operations of the Coppermines Company upon, in or under said claims and parts of claims, whether open pit or underground, * * * and, subject to the aforesaid conditions, shall continue as long as the Nevada Company shall find it necessary to use the same in connection with the underground mining operations or in operating the Liberty Pit as enlarged by operations under the provisions of this agreement. * * * "

Articles XIII to XXIV (last article), inclusive, excepting article XXIII, deal with questions of trackage, smelting charges, arbitration, notices, the termination of the contract as of June 16, 1946, and other matters not necessary to a consideration of questions involved in this case.

"Article XXIII. All the Articles, terms and provisions of this agreement shall be and be deemed to be interdependent and this agreement shall be and be deemed to be one under the laws of the State of Nevada only, and shall be construed and given effect in accordance with the laws of that State and not otherwise. * * * "

Before considering the questions in controversy, a brief reference should be made to the pleadings. Plaintiff's complaint contains many allegations of fact concerning what the parties had under consideration and what was finally agreed upon and intended to be covered by the contract as executed, and further alleges:

"23. Coppermines, on its part, either intended that said written instrument as finally executed and delivered should state accurately and truly each of the agreements so previously reached between the parties, and understood and believed that such was the effect thereof; and acting on such intention, understanding and belief caused said instrument to be executed and delivered on its part; or, it knew that Nevada had acted on, and in executing and consenting to the delivery of said instrument was acting on, such intention, understanding and belief, and with such knowledge Coppermines fraudulently encouraged and permitted Nevada to execute and consent to the delivery of said written instrument without disclosing to Nevada that Coppermines interpreted said instrument differently."

Based on the foregoing allegation, plaintiff prays relief as follows:

"D. That if the court shall find that Article IV of 'Exhibit A' does not truly state the agreement * * * as to the ore to be mined by Coppermines from Nevada's Champion and Liberty claims, * * * then that * * * said Article IV be reformed so as to conform to the said agreement as actually reached and understood between the parties."

The following is defendant's answer to paragraph 23 of plaintiff's complaint:

"15. Admits so much of the allegations * * * as states that the defendant intended said written instrument, Exhibit 'A,' to state accurately and truly the whole agreement between the parties.

"Save and except as hereinbefore expressly admitted, denies each and every allegation contained in paragraph numbered 23 of the Bill of Complaint."

Defendant in its answer, in addition to admissions, denials, and allegations, including allegations concerning a matter of estoppel, sets up ten counterclaims. By stipulation, the matters involved in defendant's counterclaims, except the first, second, and fourth thereof, are to be tried subsequent to a determination of the other issues now submitted. The fourth counterclaim is not relied upon.

By the first and second counterclaims defendant seeks an injunction against plaintiff from the mining of ore by steam shovel or other methods west of said contract plane.

It is the contention of plaintiff that the expression "all of the ore," as used in article IV of the contract, means, and was intended to mean, all of the underground ore as distinguished from ore susceptible of economic mining by steam shovel methods. It is the further contention of plaintiff that defendant may not stope at the so-called contract plane until plaintiff has completed shovel operations in the Liberty pit and particularly in the vicinity of said plane.

It is the contention of defendant that said expression, "all of the ore," means all of the ore west of the contract plane regardless of its character, and that, having reached the plane with its drifts within the time specified in the contract, it now has a right to begin stoping operations, and continue stoping to the surface.

At the opening of the trial counsel for plaintiff and defendant were in agreement in their respective contentions that the contract was plain and unambiguous and, properly construed, meant what it said. They were, however, in entire disagreement in respect to construction, particularly in reference to article IV. Counsel for plaintiff, while contending that the contract as executed expressed the agreement of the parties, reserved the right to offer testimony in support of its prayer for reformation. A considerable portion of the eight weeks consumed in taking testimony was devoted to the question of what was the actual agreement of the parties intended to be covered by the contract. In the main the testimony upon other questions was in relation to the provisions of article V, providing that mining operations shall be conducted "in a good, workmanlike manner, and in accordance with the requirements of good engineering practice, and so as not to cause or do or permit any unnecessary or unusual waste or permanent injury or inconvenience or hindrance to the subsequent operation of the properties of the respective parties hereto." Much testimony was also introduced by both parties in respect to the extent of damage that would occur to the pit and pit operations, particularly its railroad facilities, in the event defendant stoped at the contract plane before final suspension of shovel mining.

With the aid of oral argument, supplemented with more than two thousand pages of printed briefs, the court will now first undertake to determine what the four words in article IV, "all of the ore," mean, and whether they are expressive of the actual agreement of the parties.

It is conceded that in construing any article or provision of any article of the contract its meaning is to be determined with reference to other articles and provisions. Article XIII of the contract also expressly makes "all articles, terms and provisions * * * interdependent."

Article XIII further expressly provides that the contract "shall be and be deemed to be one under the laws of the State of Nevada only, and shall be construed and given effect in accordance with the laws of the state and not otherwise." In connection with this latter provision, it is proper to note that the plaintiff is a Maine corporation, the defendant a Delaware corporation, and that the principal office of both companies is located in the city of New York. In framing this provision of the contract as it relates to the matter of construction, the parties may be assumed to have had in view the many provisions of the Constitution and statutes of the state of Nevada dealing with the mining industry. Following the passage of an Act approved March 1, 1875 (St. 1875, c. 57), entitled "An Act to encourage the mining, milling, smelting, or other reduction of ores in the State of Nevada," declaring the purposes named in the act "to be for the public use, and the right of eminent domain may be exercised therefor," Judge Hawley, then speaking for the Supreme Court of Nevada, in the case of Dayton Mining Co. v. Seawell, 11 Nev. 394, 409, in sustaining the act as within legislative powers, said: "Mining is the greatest of the industrial pursuits in this state. All other interests are subservient to it."

Later, speaking for this court in the case of Douglass v. Byrnes, 59 F. 29, 32, the same distinguished jurist, considering the question of condemning a right of way for tunnel purposes through mining claims the property of another, said: "The importance of encouraging the mining industry of this state must be kept in view. This was the object,

198

intent, and purpose of the legislature in passing the act. * * * A reasonable, fair, just, broad, and liberal view should be taken by the court in interpreting its provisions."

While questions of condemnation are not presented in this case, courts, in construing contracts dealing with the subject-matter of mining, will take cognizance of the public interest in mining operations, and will assume, at least in the absence of an express provision to the contrary, that contracts are made with regard to such interest.

In addition to the cases above cited, the following are also illustrative of the state's interest and policy in dealing with matters pertaining to mining: Overman Silver Mining Co. v. Corcoran, 15 Nev. 147; Goldfield Consolidated Co. v. Old Sandstorm Gold Mining Co., 38 Nev. 426, 150 P. 313; Byrnes v. Douglass (C. C. A.) 83 F. 45; Friedrichsen v. Guaranty Trust Co. of New York (C. C. A.) 39 F.(2d) 859. See, also, Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174.

Manifestly the public interest, as expressed in the laws of the state, is in the greatest and most economical development of the properties involved in this suit. By constitutional provision, from the beginning, the taxing power of the state so far as mining property is concerned was in the main limited to the net proceeds of mines. It would be assumed, therefore, that the parties in making the contract had in view the best means of development of the ore deposit within their respective holdings. The contract, however, expressly says: "Most economically opening up and mining the ore bodies of the properties of both parties."

Independent of any special provisions relating to construction, the contract would be viewed in the light of controlling considerations and circumstances leading up to its execution. Together plaintiff and defendant were the owners of a vast deposit of disseminated porphyry ore extending below the original surface of many of the claims of both companies. The extent of the deposit within the claims of plaintiff was practically known at the time. While its extent within the claims of defendant beyond the westerly perimeter of the Liberty pit was not as definitely known, drilling had determined that many millions of tons of merchantable ore were within the confines of its claims. It was a known engineering fact that in the course of a comparatively few years mining by shovel methods in the Liberty pit would

cease to be economical by reason of the increased cost of operating by such methods as the pit increased in depth and, in turn, limited the size of operations and increased the grade of the railroad carrying cars of ore and waste out of the pit. Ultimately a tonnage estimated at around 70,000,000 tons below a final pit level would have to be mined by underground stoping methods through shafts and drifts.

It is clear from article IV of the contract that defendant upon sinking a certain shaft is granted the right to mine in plaintiff's Champion and Liberty claims. It says that, "except as otherwise in this Article provided, * * * all of the ore * * * westerly from a vertical plane * * * estimated * * * at five million, three hundred fifty thousand (5,350,000) tons * * * shall be mined by the Coppermines Company." One of the exceptions specifically mentioned is that, if defendant shall not be able to mine such an amount of ore within said claims "by reason of the exhaustion of the ore," then the right is given to mine from other of plaintiff's claims an amount of ore that will at least make such aggregate tonnage. The article expressly states that "it is the intent" to grant "the right to mine and remove from the Champion and Liberty claims or other claims * * * at least 5,350,000 tons of merchantable ore."

The expression, "by reason of the exhaustion of the ore," is significant. Exhaustion of ore in mining parlance has a well-understood meaning. It means its depletion by mining operations. The words were clearly so used in this article. A similar expression used in the same sense also occurs in article VIII of the contract. The ore mentioned in article IV could not become so exhausted unless plaintiff carried on shovel mining at and west of the contract plane. That it could be so exhausted is plainly suggestive of the right of plaintiff to so exhaust a portion of the ore within the estimated tonnage west of the contract plane.

The expression "all of the ore" is, in substance, twice used in article IV. As first used it applies to the Champion and Liberty claims only—"all of the ore in the Champion and Liberty claims." As next used the words appear, "all the ore therein." The word "therein" is inclusive, not only of the Champion and Liberty claims, but of "other claims." The expression "all the ore" as used in the second instance shows clearly that the words "all of the ore" as used in the first instance were not intended to be inclusive of.

all of the ore existing in the Champion and Liberty claims west of the contract plane at the time the contract was executed or at the time the shaft drifts and raises were completed, but only all the ore subject to mining by underground methods after shovel mining was concluded.

This case is only one of many in which courts have had occasion to limit the meaning of the word "all" to all of a particular kind or class. United States v. Howland, 17 U. S. (14 Wheat.) 108, 4 L. Ed. 526; Lane v. Vick, 44 U. S. (3 How.) 464, 11 L. Ed. 681; Chouteau v. Molony, 57 U. S. (16 How.) 203, 14 L. Ed. 905; Heydenfeldt v. Daney Gold, etc., Co., 93 U. S. 634, 23 L. Ed. 995; Alabama v. Montague, 117 U. S. 602, 6 S. Ct. 911, 29 L. Ed. 1000.

There is no express language in article IV saying that defendant may stope at the contract plane immediately upon the completion of its shafts and drifts. The provisions of the article are only that defendant "shall have the right to stope at said plane or easterly up to said plane before the Nevada Company shall stope westerly thereto" whenever the plaintiff shall begin stoping underground. One, if not the sole, reason for this prior right of stoping at the contract plane, is that defendant shall have the benefit, in addition to the estimated tonnage, of "such boundary ore * * * as may incidentally be drawn in the ordinary course of mining." This "boundary ore" is a substantial tonnage for the mining of which plaintiff is required to compensate defendant. Of course if plaintiff in its pit operations may mine by shovel methods west of the contract plane, the quantity of such "boundary ore" is also reduced. As this "boundary ore" was in addition to the guaranteed tonnage, and comparatively of small amount, there is no reasonable basis for an assumption that the parties considered it of such importance as to affect general pit operations.

◼ Defendant further contends that by the terms of article IV it is granted the option to begin stoping at said contract plane and stope westerly therefrom to the westerly boundary of said Champion and Liberty claims, or to begin stoping at said westerly boundary and stope easterly to said plane, and it has elected to begin stoping at said plane. This would or might be true if there were no other provisions of the contract or controlling circumstances to be considered. It is a fundamental principle of construction that all contracts are to be construed in the light of the circumstances surrounding their execution.

If defendant may now stope at the contract plane, then we have the situation of the plaintiff, with a vast investment or expenditure of several millions of dollars in pit and pit equipment, consisting of grade benches, tracks, yards, engines, cars, power shovels, and many other adjuncts, agreeing to place a five-year maximum limit on its general pit operations which might be reduced to two years, in order to gain a temporary privilege of extending its pit benches and tracks through certain then undeveloped mining claims of defendant, in order that it may the more advantageously carry on pit operations within its own claims. Whether or no it may not have accomplished the same purpose by a resort to condemnation, it is hardly conceivable that the directing officers of a great mining company would deliberately make a contract placing the property in danger.

◼ It is manifest from a reading of article IV that the main purpose of the article was to insure to defendant the right to mine "at least 5,350,000 tons of merchantable ore within the term hereinbefore (life of this instrument) specified." It is appropriate here to note that the estimated tonnage referred to in article IV was above the 6,600 (sea) level. Defendant's shaft, with plaintiff's approval, was extended to the 6,470 level. By lowering the "cut off," meaning copper content in ore classed as "merchantable," the quantity of "merchantable ore" to be mined by defendant in the Champion and Liberty claims above the 6,470 level is practically twice the amount of the original estimate.

◼ The provisions of article V are to be read in connection with all other provisions of the contract relating to the actual mining of ore. By that article mining is to be done "in accordance with the requirements of good engineering practice, and so as not to cause or do or permit any unnecessary or unusual waste or permanent injury or inconvenience or hindrance to the subsequent operation of the properties of the respective parties."

◼ A great deal of testimony was offered by both parties at the trial upon the question of the proper sequence of mining the ore to be mined by defendant in the Champion and Liberty claims. It is sufficient in that regard to say that distinguished mining engineers were not in entire accord as to whether the best mining methods required stoping to begin at the westerly extremity of the ore deposit and move easterly towards the contract plane, or to begin at the contract plane and stope westerly therefrom. As the court now recalls this very interesting phase of the tes-

timony, little or no testimony was directed to the methods which would be regarded most economic in the event one company owned the claims of both parties to the suit and was desirous of contemporaneously prosecuting the extraction of ore to the greatest advantage both easterly and westerly of the pit perimeter. The court is impressed that, assuming defendant has the right to first stope at the contract plane, and considering its interests alone, it would be to its advantage to so stope. The overburden of waste has been largely or entirely removed at that point and for a considerable distance to the west. There would be a greater tonnage of ore to be extracted for the account of plaintiff.

In the stoping of a disseminated porphyry ore body dilution of the ore occasioned by subsidence of the waste capping is one of the matters which mining practice requires to be reduced to a minimum. Even if it be conceded that there would be less dilution by stoping westerly from the contract plane, it does not follow that the best mining methods, considering the two properties together, would justify pursuing that course. That the ore in the Champion and Liberty claims to be mined by defendant for the account of plaintiff can be mined according to recognized mining methods by stoping easterly instead of westerly, the court from the testimony has no doubt. With the exception of the effect upon pit operations, plaintiff's interest in the use of the best mining methods by defendant for ore extraction within its claims would seem to be as great if not greater than that of defendant. It is plaintiff's ore. Whatever of question there may be respecting the best sequence of mining in these two particular claims considering the interests of the parties separately, there is no question in the opinion of the court that, if the combined properties were in a single ownership, there would be no mining by underground methods in the Champion and Liberty claims easterly of the pit perimeter until shovel operations in the pit which might be affected thereby were concluded. It is economic mining, viewing the ore deposit in its entirety, that should be and is controlling. This, as the court construes it, is the clear meaning of the contract.

Power shovel open pit mining is conceded to be the most economic method of extracting ore from disseminated porphyry ore deposits, where the overburden to be first removed is not too great, until the pit reaches such a depth that the difficulty and increased cost of getting ore trains or cars out of the pit renders that method no longer justified.

It is important to consider what provisions are contained in the contract respecting any time limit for suspension or limitation of shovel mining by plaintiff in the Liberty pit. The first statement in what may be regarded as the preamble of the contract is that plaintiff "now proposes to complete its open pit mining operations thereat as soon as practicable, and meanwhile and thereafter purposes to begin underground mining in said pit and in territory in the vicinity thereof." By article II it is provided that plaintiff "shall with reasonable despatch * * * as a part of its * * * shovel operations commence the mining of ore from the said Ora and Emma Nevada claims, or either of them. * * * If the Nevada Company shall continue its * * * shovel mining below said tenth level of the Liberty Pit it agrees that it will continue so to mine * * * any additional merchantable ores in said Ora and Emma Nevada claims, below said level, * * *." By Article III it is provided: "All ores * * * from the Ora and Emma Nevada claims * * * occurring below approximately the tenth level * * * or below whatever level to which the Nevada Company shall carry its shovel Liberty Pit operations shall be mined by underground methods. * * *" By article XII it is provided: "The Coppermines Company * * * grants * * * rights of way * * * in its pit benches over or through any * * * claims covered by Article I hereof and into which said Liberty Pit may be extended * * * as may be necessary in order to keep the pit spirals unbroken and continuous and so permit and preserve a practicable method of pit haulage in the current and future direction of the Nevada Company's general Liberty Pit operations; provided * * * such trackage rights of way shall be subject to the right of the Coppermines Company at any time to extract and remove material or ore * * * from any portion of said mining claims. * * * All trackage rights * * * subject to the aforesaid conditions, shall continue as long as the Nevada Company shall find it necessary to use the same * * * in operating the Liberty Pit as enlarged by operations under the provisions of this agreement. If and whenever the Nevada Company shall permanently cease both underground and shovel operations * * * then the trackage rights * * * shall * * * cease."

It is clear from a reading of these excerpts from the contract that no definite time was fixed when shovel operations would cease. It is also clear both from the contract

and the physical facts and circumstances with which the contract deals that shovel mining would be expected to continue until the element of relative cost of ore production became a deciding factor. Plaintiff has sunk and equipped its Wedge shaft at a cost of approximately $1,500,000, and is now sinking another shaft on its Monitor claim, both designed for mining below the final shovel pit level by underground methods. It may be assumed that open pit mining will cease when it is no longer "reasonably practicable or profitable" to so mine. It does not appear from the evidence submitted that such time has arrived.

The provision in article IV that the defendant will give plaintiff "thirty days written notice whenever it is ready to commence mining operations under this Article, and thereupon and reasonably from time to time, the Nevada Company will give  *  *  *  directions in writing covering all development work within the mining claims of the Nevada Company which may be necessary to carry on mining operations required by this Article, and the Coppermines Company will do all such development work," reserves a controlling direction in plaintiff, subject of course to reasonable action, in respect to development work within its claims for mining to be done for its account by defendant. A similar controlling direction is given to defendant covering development work within its claims to be performed by plaintiff.

It is clear from the contract as written that defendant is without right thereunder to prosecute mining by underground methods at the contract plane, or westerly thereof beneath the surface of the Liberty pit, prior to the completion by plaintiff of the open pit mining operations in that area, the plaintiff in the meantime prosecuting its pit operations with reasonable diligence and in accordance with good engineering practice.

This conclusion makes it unnecessary to review the evidence in respect to what was the agreement of the parties intended to be embraced within the written contract.

It is contended that plaintiff is estopped to assert that defendant is without right to now pursue underground mining at the contract plane. It is claimed (1) that the plaintiff changed its plans with respect to open pit and underground mining as such plans existed at the time of the execution of the contract; and (2) that defendant in sinking its Emma Nevada shaft to the 6,470 level, and in extending drifts from such level to and within the Champion and Liberty claims,

so proceeded with the approval and direction of plaintiff. It is defendant's position that at the time of the execution of the contract plaintiff intended to cease active shovel operations upon the completion of its Wedge shaft, and intended to complete the pit to the ninth level, or at the most to the tenth level; that, shortly after the completion of the Wedge shaft, plaintiff changed its plans, and decided to greatly extend its open pit steam shovel operations and indefinitely delay mining by underground methods.

It is unnecessary we think to consider the testimony with respect to whether or no there was a material change in the plan of pit operations as contemplated by the plaintiff at the time of the execution of the contract. Assuming that there was a subsequent substantial change from the then plan of operations, the material question is whether there is anything in the contract limiting the plaintiff in that respect. The contract makes no reference to any limitations with respect to open pit operations. It is clear from a reading of the contract that plaintiff had the right to change its plans from time to time so long as they were not inconsistent with good mining practice. All of the circumstances of the case would seem to support the view that open pit operations would continue so long as that method of mining was more economical. The contract by specific terms places no limit upon the depth shovel mining may be extended.

Counsel for defendant lays stress on certain correspondence between various officials of the respective parties concerning the sinking of the Emma Nevada shaft and the driving of drifts and haulageways therefrom. Relative to the sinking of this shaft, the president of the defendant company wrote to the general manager of the plaintiff company on September 28, 1926, among other matters as follows: "We shall be glad to have your suggestions concerning the shaft, as to its size, equipment and the elevations at which you desire the levels run, and any other suggestions in connection with the matter which you may care to submit."

A letter from the then general manager of the plaintiff, of date December 7, 1926, so far as material, reads as follows:

"Replying to your letter of September 28th, last, wish to advise that the station in your Emma Nevada shaft which best fits in with the mining of Nevada Consolidated ores along the boundary plane and other Nevada ores westerly of this plane, as well as which best suits the mining of the Emma Nevada

ores, is at the same sea-level elevation as the 'B' level of the Nevada Consolidated Copper Company's Wedge shaft, which is at the 6,470 sea-level elevation.

"We recommend that your Emma Nevada station be at 6,470 sea-level elevation for best service and most economic mining through the Emma Nevada shaft of a major portion of the ores above referred to."

A letter of date December 22, 1926, from the general manager of the plaintiff to the president of the defendant, in so far as the same is deemed material, reads:

"It is natural, however, in the sinking of your shaft that the local managements of the two companies should co-operate in the selection of proper station elevations in the Emma Nevada shaft, for the reason that this has to do with most economic mining of the ores of one company by the other, and is in line with the treatment contract. As agreed yesterday in our conference, the station elevations in the Emma Nevada shaft should be 6,470 for the Emma Nevada bottom level, which is the same as the bottom level of the Wedge shaft; the next station in the Emma Nevada shaft best suited to the mining of Coppermines and Nevada ores as a whole based on present ore developments is approximately 6,560 elevation; the next level which was agreed to in conference was at sea-level elevation 6,660.

"This agreement on station elevations will definitely outline your shaft program for the next eight months period, within which time the Nevada Wedge shaft will be under full tonnage and the matter of swapping ores to be mined by either company as per the contract can be adjusted with mutual advantage to both companies."

The contract contains no provision giving any power to the plaintiff to dictate concerning station levels in the shaft which defendant contracted to construct upon its own property. The only specific provision in the contract in respect thereto was that the shaft should be sunk "to a depth of at least 600 feet." There is, however, the further provision in article XII "that the workings of both companies in the vicinity of the Liberty pit shall be connected so as to facilitate ingress and egress and ventilation to and for each party hereto."

It is manifest from the physical facts established by the evidence in the case, particularly the location and extent of the ore bodies within the Champion and Liberty claims as well as certain ore bodies in claims belonging to defendant, that it was advanta-geous to sink the Emma Nevada shaft to the 6,470 sea-level elevation. Some contention has been made by plaintiff that under the contract defendant would not have the right to mine ore in the Champion and Liberty claims below the 6,600 level. The contract we think is not susceptible to such construction. It is clear that, if a level had been run on the 6,600 elevation, it would have penetrated, but would not have been below, the ore body in the Champion and Liberty claims. It is also clear that the ore body in plaintiff's Champion and Liberty claims to be mined by defendant can best be so mined from the 6,470 level. It does not follow, however, from these letters, that any right was given or conceded to defendant to mine first at the contract plane. The only matters discussed in these letters were station elevations. They were matters important to be discussed and be determined at that time. They should be viewed in the light of the fact that the contract covered a period of twenty years, during which time several million tons of ore were to be mined underground and hoisted through the shaft. It will be noted that nothing appears in these letters respecting what drifts should first be run. To the present time defendant has extended a drift on the 6,660 level to the ore bodies in its own claims, and on the 6,470 level to the Champion and Liberty claims. A level has not as yet been run on the 6,560 elevation.

On March 2, 1927, the general superintendent of defendant wrote a letter to the assistant general manager of plaintiff as follows:

"We have been discussing informally with Mr. Larsh the level arrangements of the Emma Nevada shaft. We would like to have your instructions as to the general arrangements and the necessary details in regard to the mining of your ore, so that we may arrange for the material and plan for the work to proceed economically and without delays."

This letter was replied to of date March 24, 1927, as follows:

"With reference to your letter of March 2nd, * * * I wish to call your attention to letter of December 7, 1926, written by Mr. Lakenan and addressed to Mr. Howard D. Smith, in the last paragraph of which he states that a station in your Emma Nevada Shaft at 6,470 sea level elevation is best for service and most economic mining through Emma Nevada shaft for a major portion of the ores in question. I presume your inquiry has to do principally with our Block 4–B, which I understand, in line with your plan,

is to be mined first. There are certain cost estimates and study of sections which we have not completed and we are not at the moment prepared to give you the development within our mining claims. This study will be taken up at the earliest possible moment, and when completed we will give you the development within the Nevada Company's mining claims as provided in Article IV, Par. 31, Page 11, of the June 16, 1926 agreement. This will be done in sufficient season so that the development from your shaft to the boundary of our mining claims will not be delayed or costs in connection therewith interfered with in any way."

The last foregoing letter was replied to on April 12, 1927, as follows:

"* * * We trust that you will give us the information requested at as early a date as you can as we desire to do the necessary development work both for reaching and in the ore bodies for you as economically and promptly as possible."

The next letter in reply is of date May 3, 1927, and reads:

"I presume that this request has to do with the mining of our block known as 4–B in the southwest corner of the Liberty Pit. In this connection I wish to call your attention to the fact that, although in my letter to you of March 24th I state that we will furnish outline of development within the Nevada Company's mining claims, your acknowledgment as well as your letter to me of April 12th indicate you have overlooked the limitations set up in my letter, that is 'work within our mining claims.'

"We are ready at this time to furnish you with plans and sections of the orebody in question, as well as our ideas as to the proper location of haulageways, etc., to reach that orebody for the most economical program. This, as well as any other suggestion from us in the past anent the situation, has been in the nature of friendly suggestions, in an effort to co-operate under Article 12, for the most economical opening up and mining of our orebodies. If you understand our position and are prepared to receive suggestions on this basis, we will be glad to continue to express ourselves in this manner, but in so doing we are not requesting you to do any work for our account.

"We want to make it clear that the directions we will give under Article IV are not due from us until your workings in your claims have reached our boundaries, and you are ready to commence mining operations within our claims, and shall have given us

notice of that fact and of your intention to commence mining our ores within thirty days thereafter. We will expect such written notice when your workings shall have so far advanced as to permit you to give it, that is, when you shall have reached a point in your developments that through them you will be able to commence mining in thirty days, within our claims.

"Further answering your letter of the 12th, I want to state that in the spirit of friendly co-operation above expressed, and apart from strict adherence to the letter of contractual obligation, we are doing our best to outline what we think should be the proper procedure for the most economical operation."

A letter of date October 10, 1927, from the general manager of defendant reads:

"Please be advised that we have finished sinking the Emma Nevada shaft and that we have commenced work on the level at 6,470 ft. elevation.

"We again wish to call your attention to the necessity of you giving us instructions as to the necessary development to reach the ore bodies on this level, and we request you to do so immediately."

The foregoing letter was replied to on October 15, 1927, as follows:

"Referring to your letter of October 10th * * * I beg to refer you to my letter of May 3, 1927, which sets forth our position in respect of this matter, and to say that nothing has transpired to change our position as stated.

"In line with that letter, and particularly the concluding paragraph thereof, and as I indicated to you on the 10th instant in conference with you, Mr. Smith and Mr. Gow, Mr. Larsh and our engineering department at the mines are ready to go over your plans and offer any suggestions in order that the development within your claims will be such that they will reasonably coincide with our proposed development within our boundary lines for the mining in an economical manner the ore blocks in question. Mr. Larsh has already been advised of this and a carbon of this letter will serve as further instructions to him in this particular."

A letter of date November 5, 1927, from the general manager of defendant, in part reads:

"I note that you still adhere to your previously made statement that the Nevada Consolidated Copper Company shall not pay for any development work outside of their min-

ing claims, although such work is being done for the purpose of reaching their ore bodies in order to prepare them for mining. * * *

"After receiving your plans for the complete development on the 6,470 level, we will be in a position to prosecute your work most advantageously and economically to you, so I urge that these plans and directions be submitted at an early date."

On November 16, 1927, the general superintendent of plaintiff wrote as follows:

"Referring to the concluding paragraph of Mr. Kinnear's letter of October 15th and under the limitations and conditions stated in his letter to you of May 3, 1927, I submit herewith a map (our G-337) showing horizontal development program desired by our Company affecting the ore Block 4-B of the Champion and Liberty claims.

"Having been heretofore advised by you of the station level in your Emma Nevada shaft and certain of your planned workings therefrom designed to exploit this ore body (your Drg. F-95), you will note the elevations and coordinates of the proposed workings at the intercompany boundary line. These are determined with a view to your reaching them from your Emma Nevada shaft by practical and economical mining approaches through your Company's ground, which in part you have already determined."

The letter of date January 4, 1928, from the general manager of defendant, reads:

"We have repeatedly asked you for complete instructions and development plans for all work that we are doing for you from and in connection with the Emma Nevada shaft, but as we have not received any such instructions and plans, please be advised that we are proceeding in carrying on the various phases of the development and arranging for equipment according to our best judgment.

"The general plans and all other data for this work are available for your inspection and we again invite inspection and comments."

On January 31, 1928, a further letter was written reading as follows:

"We have repeatedly asked you for full instructions as to all the work which we are carrying on for your account, not receiving such full instructions, as requested, we propose to construct pockets, 6,470' level, and other work in connection, as per blue print enclosed herewith. Please advise us immediately of changes, if any, which you wish us to make."

This letter was replied to on February 9, 1928, as follows:

"Answering yours of January 4th, in which you say you have 'repeatedly asked for complete instructions and development plans for all work from, and in connection with, the Emma Nevada shaft.'

"Nevada Consolidated Copper Company's duty as to giving directions for development work is plainly stated in the next to the last paragraph of Article IV, page 11, of the contract, as follows: * * *

"Under these provisions the sequence of the steps, as we see it, is as follows:

"1. Coppermines is to first get itself ready to commence mining operations directed solely to Article IV ore bodies;

"2. Coppermines is then to give the thirty days' written notice that it is ready to commence such operations;

"3. Thereafter, Nevada is to give written instructions covering all development work within its claims. Any such directions from us will be limited to work within the Liberty and Champion claims. They will be further limited to work to be done in the ore bodies and/or necessary to reach and mine such ore bodies.

"None the less, as you know, in the spirit of friendly co-operation, and from as early as December, 1926, some of our operating officials have been making informal suggestions as to the work. * * *

"We are glad to make such operating suggestions; * * * but such informal suggestions are in no way binding on you, and are in no sense to be considered as the written instructions for development work referred to in Article IV of the contract between us. Any such formal instructions will only come from us in response to your formal notice that you are ready to commence mining under Article IV."

A letter of date October 11, 1928, addressed to the defendant, signed by plaintiff by its assistant managing director, is headed:

"Directions for Preliminary Development Work by Coppermines Within Nevada's Champion and Liberty Claims."

This letter in part reads:

"In accordance with Nevada's letter to Coppermines of September 10, 1928, the following preliminary development instructions are hereby given by Nevada to Coppermines:

"(A)—For the development in preparation for mining of Nevada's ores, * * * Coppermines is requested and directed to first

develop the tonnage of Champion ore on the upper horizon which is tributary to the 6,660 ft. haulage level of the Emma Nevada shaft. * * *

"(B)—Either concurrently with or subsequently to the above development * * * Coppermines is requested and directed to develop the tonnage in the Champion claim lying above the 6600 ft. level above sea in the area shown as 'Block 6–A' * * * which is tributary to the 6,560 ft. level of Coppermines' Emma Nevada shaft. * * *

"Coppermines is specifically instructed to immediately discontinue the driving of a drift on the 6,470 level of Coppermines' Emma Nevada shaft, which it has already driven some fifty feet in Nevada's Champion claim without giving Nevada any written notice and without receiving from Nevada any instructions so to do and contrary to Nevada's expressed wishes and desire and contrary also to the provisions of the contract. * * * "

The letter last quoted was not written until after defendant's 6,470 level had been extended to plaintiff's property line, and can have little or no bearing upon the question of estoppel. It is instructive, however, in so far as it reflects differences existing between the parties respecting the meaning of the contract.

The correspondence between the parties prior to the beginning of the driving of the 6,470 level from the Emma Nevada shaft would not, we think, be sufficient to support an estoppel even though there was no other evidence proper to be considered. The evidence clearly establishes that prior to the beginning of the construction of the Emma Nevada shaft defendant took the position that it was entitled to mine all of the ore then west of the contract plane. As early as October 27, 1926, defendant wrote plaintiff, among other matters, saying: "Meanwhile, you will of course not mine and remove any of the merchantable ore which, under Article IV of that contract, we are to mine."

On November 17, 1927, shortly after the drift was started, defendant's president wrote: "Furthermore, you have dug contrary to said contract a large tonnage of ores in the vicinity of and west of the plane de-

scribed in Article IV which we are to dig, thereby again violating the contract."

It is clear from the evidence that defendant, in driving the 6,470 drift, was proceeding upon its interpretation of the contract that it had the immediate right to mine at the contract plane as soon as it was able to reach that position. It cannot, we think, be said that defendant was misled into taking a position which it would not otherwise have taken except for statements and conduct of plaintiff. Whatever other rights defendant may have growing out of the driving of the level in question, essential elements of an estoppel are lacking. Wiser v. Lawler, 189 U. S. 260, 23 S. Ct. 624, 47 L. Ed. 802.

This disposes of the main question in controversy—plaintiff's right to an injunction.

■ At the opening of the trial, counsel for defendant suggested that the court consider defendant's third counterclaim as to the question whether defendant was entitled to damages by reason of alleged failure upon the part of plaintiff to mine certain ore in defendant's Ora claim, the amount of damages, in the event defendant was entitled thereto, to be determined upon the trial of the issues presented in the other counterclaims when such issues were tried in accordance with the stipulation. The court reserved ruling upon the request, and is now of opinion that issue can best be determined at the time of trial of the counterclaims yet to be disposed of.

Plaintiff is entitled to the decree of this court as prayed for, enjoining defendant from mining at and west of the contract plane below the pit area until shovel mining therein, prosecuted with reasonable diligence and in accordance with good mining practice, is concluded.

While plaintiff has also prayed for an injunction against defendant mining in its own Ora claim so as to endanger plaintiff's Wedge shaft, it has not been shown that defendant is contemplating any immediate mining in that claim; hence no consideration is given to that phase of the case.

From the granting of an injunction in favor of plaintiff it follows that defendant is not entitled to the similar relief by it prayed for, and its first and second counterclaims are dismissed.