## CONSOLIDATED COPPERMINES CORPORATION v. NEVADA CONSOLIDATED COPPER CO.*
### No. 6609.

Circuit Court of Appeals, Ninth Circuit.

April 6, 1933.

John P. Gray, of Cœur d'Alene, Idaho, and George B. Thatcher, of Reno, Nev., for appellant.

William Wallace, of New York City, and Charles S. Chandler and Wm. E. Colby, both of San Francisco, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

SAWTELLE, Circuit Judge.

This is an appeal from a decree enjoining the appellant from prosecuting certain mining operations in the appellee's Champion and Liberty claims, in the Robinson mining district, White Pine county, Nev. The court below reserved jurisdiction of the cause for the purpose of making any future order modifying the decree, and particularly to determine the merits of certain counterclaims urged by the appellant.

The case turns on the interpretation of a certain mining contract entered into by the appellant and the appellee. A complete statement of the facts and the law involved in this controversy is to be found in the able and exhaustive opinion of the court below, reported in (D. C.) 44 F.(2d) 192–205, which it is unnecessary to reproduce here. We have carefully read that opinion, the elaborate briefs on appeal, and a goodly portion of the voluminous transcript. We find ourselves in agreement with the conclusions reached by the District Judge, and accordingly the decree is

*Rehearing denied June 5, 1933.

affirmed, with the reservations as to future jurisdiction therein contained.

Decree affirmed.

WILBUR, Circuit Judge (dissenting).

I am unable to agree with the conclusion reached by the majority adopting the opinion of the trial judge, reported in (D. C.) 44 F. (2d) 192, as the opinion of this court, and will state some of my reasons therefor as briefly as may be, considering that the record contains 2,766 pages and the briefs 376 pages.

The portion of the agreement dated June 16, 1926, between the appellee, hereinafter called the Nevada Company, and the appellant, hereinafter called the Coppermines Company, involved in this litigation, is article IV thereof. The provisions of this agreement of June 16, 1926, are quoted in part in the second paragraph of Judge Norcross' opinion and more extensively later in the opinion, to which I refer to avoid a repetition thereof in the reported decisions. Nevada Cons. Copper Co. v. Consolidated Coppermines Corp. (D. C.) 44 F.(2d) 192, 194, col. 2, 195, col. 1.

In article IV it was expressly agreed in part that "all of the ore in the Champion and Liberty claims of the Nevada Company extending westerly from a vertical plane coinciding with and passing through a line extending from the northeast corner of the Westphalia claim to the southeast corner of the Emma Nevada claim, estimated by the Nevada Company at five million, three hundred fifty thousand (5,350,000) tons of merchantable ore, together with such boundary ore wherever situate east or easterly and/or west or westerly of said plane as may incidentally be drawn in the ordinary course of mining from drifts and raises which may extend to, but which are not to extend beyond, said plane, shall be mined by the Coppermines Company for the account of the Nevada Company."

The plane thus fixed is definite and certain, and it is not contended otherwise. It also was expressly agreed in other portions of article IV, not herein quoted, that the Coppermines Company would sink and equip, within five years from the execution and delivery of the contract (June 23, 1926) a four-compartment shaft to a depth of at least 600 feet. The opinion of the majority proceeds upon the theory that this definite and fixed boundary line between the ore to be mined by the Coppermines Company and by the Nevada Company is modified by other provisions of the contract and by the general pur-

pose and spirit of agreement. A map is essential to an understanding of the contract. I therefore incorporate one here.

and thereafter recover the balance of the ore by underground mining. To that end it had already commenced to sink its wedge shaft

Reference is also made to the statement of facts in the main opinion.

As stated in the majority opinion, the general spirit of the agreement as derived therefrom and from the circumstances of the parties at the time of the execution of the contract, from the nature of the ores deposited, and from the method of mining contemplated, was no doubt that of developing the ore in the most economical fashion. That this was in the minds of the parties must be evident from the fact that the ore was of relatively low grade, and economy in mining and smelting was essential in order that a reasonable return might be derived by the owner of the ore from its production. There are some facts omitted from the majority opinion which I think bear upon the general intent of the parties. Although it is true that the contract on its face indicates a purpose to conduct pit mining to and below the tenth level, in some portions of the pit, there is also evidence which strongly indicates, if it does not demonstrate, that at the time the contract was executed it was the purpose of the Nevada Company, which was conducting the pit operations, to complete its shovel mining in the pit within five years, then wreck the pit,

which, when finally completed, cost a million and a quarter dollars. A similar shaft was agreed to be sunk within five years by the Coppermines Company which, with the contemplated drifts over to the ore body in the Liberty and Champion claims at the 6,470-foot level, have actually cost about $2,000,-000, $750,000 of which was involved in sinking the shaft to a depth of 6,470 feet above sea level. Here it should be observed that in dealing with the question of depths of mining the parties have adopted a plan of estimating the elevations from sea level, as the mining is conducted on a mountain top. Consequently, the lesser figures indicate the greater depth. The height of the mountain at the edge of the pit in a cross section through drift 261 driven by the Coppermines Company is approximately 7,350 feet above sea level. The opinion of the trial judge, adopted by the majority, relies considerably upon the fact that the amount of merchantable ore in the Champion and Liberty claims west of the plane described in article IV of the agreement, supra, which is referred to by the parties and will hereinafter be referred to as the "contract plane," was estimated in the contract to be 5,350,000 tons. It is stated in

the opinion that the quantity of merchantable ore to be mined by the defendant in the Champion and Liberty claims, above the 6,470 foot level "is practically twice the amount of the original estimate." This increased estimate (11,000,000 tons) is by reason of the fact that ore of a lower copper content (six-tenths of 1 per cent.) is now classed as merchantable, whereas at the time of the contract, eighty-five hundredths of 1 per cent. was considered the lowest copper content. In other words, there is now estimated to be about 5,000,000 tons of ore in the Champion and Liberty claims west of the contract plane which has content of less than 17 and more than 12 pounds per ton of copper and other recoverable metals. In this connection it should be remembered that there is no distinct line between the ore body and the surrounding rock, but that all the rock in the vicinity is more or less mineralized, and the amount of rock to be removed as ore depends upon economic considerations; that is to say, it depends upon the market value of the product and upon the relative cost of production of that product. A lower market price of the copper and silver produced would decrease the amount of "merchantable ore," while a decrease of the cost of production, due either to greater efficiency or to lower wages paid to labor, would increase the amount of "merchantable ore." Thus, while the amount of mineralized rock in the claims remains constant, the amount of "merchantable ore" fluctuates with changed economic conditions. Consequently, the fact that after a lapse of five years from the execution of the contract it can be said that the amount of "merchantable ore" in the Champion and Liberty claims is double that estimated in the contract is neither conclusive nor persuasive as to the proper construction of a contract which on its face is based upon a content of 5,350,-000 tons of recoverable or merchantable ore, and should be interpreted in the light of that stipulated and agreed fact, and not with reference to some subsequently discovered or developed fact.

In departing from the plain language of the contract, the majority opinion also is based upon the phrase concerning the exhaustion of the ore west of the "contract plane" in the Liberty and Champion claims. It is said that, although there was estimated to be 5,350,000 tons of "merchantable ore" in the Champion and Liberty claims west of the contract plane, it was evidently contemplated by the terms of the contract that in some fashion this amount of 5,350,000 might be "exhausted," and from this premise the inference is drawn that this "exhaustion" might result from the shovel mining operations of the Nevada Company west of the "contract plane" which would deplete the quantity of 5,350,000 tons, and that this depletion was then to be made up to the Coppermines Company by permitting it to mine enough ore at the contract price from the other claims of the Nevada Company to make up for this depletion. The conclusion is that the contract itself thus provided for and consequently assumed that the Nevada Company was to remove all the ore west of the contract plane that could be so removed profitably by shovel mining and the balance only was to be removed by the underground operations of the Coppermines Company. I do not think the contract justifies this conclusion. In my opinion "exhaustion of the ore" west of the "contract plane" in the Liberty and Champion claims contemplated by the contract is its total exhaustion by reason of the underground mining operations of the Coppermines Company, and not by partial exhaustion by the shovel mining operations of the Nevada Company. The reason for this provision granting to the Coppermines Company the right to mine ores in other mining claims of the Nevada Company through the shaft which it agreed to sink and through the drifts therefrom, arises from the fact that, owing to the great expenditure necessary in sinking the shaft and running the drifts ($2,000,000) and preparing for mining, it was essential that at least ten million tons of ore (5,350,000 of it from the Liberty and Champion claims and the balance from the mining claims of the Coppermines Company) be removed by the operations through the shaft in order to justify the capital expenditure involved in preparing for mining. Consequently, if it should appear when all the merchantable ore west of the contract plane had been removed, that is, to use the contract phrase under consideration, when the ore was "exhausted," that less than 5,350,000 tons of ore had been realized from these claims by the venture, the Coppermines Company was then to have an opportunity to recoup its loss by mining the amount of ore necessary to make up the amount of 5,350,000 tons by mining other ore in other claims of the Nevada Company. I think the position of the appellant in that regard is correct. I quote from appellant's brief as follows:

"What restriction do we here find upon the right of Coppermines to mine all of the ore in the Champion and Liberty claims west of the contract plane? Is there any exception in the grant? We submit there is none.

The purpose of this sentence and this provision in the contract is not to restrict the right of Coppermines to mine all of the ore in the Liberty and Champion claims west of the contract plane, or to except any part thereof from the terms of the grant, but, on the contrary, is intended as a guarantee and assurance to Coppermines of the estimated tonnage set forth in the first sentence.

"The intent of the provision is clear. It contemplates that when Coppermines shall have exhausted the ores within the area by its mining operations, and if it be then found that there were not 5,350,000 tons therein, Nevada will give to Coppermines adjacent or other claims to be mined which will guarantee to it a tonnage of 5,350,000 tons. In this connection it must be borne in mind that the exhaustion contemplated is exhaustion by Coppermines, this for the reason that a grant has already been made in the article to Coppermines to mine all of the ores west of the contract plane, and this without reservation, exception or restriction."

The main opinion refers to the fact that the phrase "all the ore" is used twice in article IV [Id. (D. C.) 44 F.(2d) 198, col. 2, par. 4], first in connection with the phrase "in the Champion and Liberty claims," and next with the word "therein," and deduces therefrom the conclusion that the phrase in the first instance, "all the ore in the Champion and Liberty claims west of the contract plane," means only "all the ore subject to mining by underground methods after shovel mining was concluded," thus interpolating into the contract an exception from "all the ore" of all ore recoverable by shovel mining.

I think the appellant's position is correct that the phrase "all the ore therein" refers only to the ore in the Champion and Liberty claims, and that the proposition involved is correctly stated in the appellant's brief, as follows:

"The phrase clearly refers to the ores in the Champion and Liberty claims only. The words 'all the ore therein' cannot refer to the ore in the other claims but is a direct reference back to the ore in the Champion and Liberty claims and is identical in substance with the expression 'all of the ore' as used in the first sentence of Article IV in the grant to Coppermines. The undoubted meaning of the phrase is simple. It means that if more than 5,350,000 tons be found to exist in said Champion and Liberty claims west of the contract plane then Coppermines has the right and is under duty to mine and remove all the ore therein which can be advantageously and economically mined and removed. If more than 5,350,000 tons of ore are found to exist in the Champion and Liberty claims west of the contract plane then Coppermines is limited strictly to that area and the expression 'all the ore therein' is not inclusive of other claims but refers specifically and only to the Champion and Liberty claims west of the contract plane and definitely limits Coppermines' mining to 'all of the ore' in those claims west of the plane. The words 'all the ore therein' have no purpose unless more than 5,350,000 tons can be mined in the Champion and Liberty claims west of the contract plane, in which event the provision for Coppermines mining in Nevada ground outside that portion of the Champion and Liberty west of the plane does not become effective."

These two provisions of the contract (article IV), with reference to the "exhaustion" of the ore, and the second use of the phrase "all of the ore" are strongly relied upon by the trial judge in his conclusion that the phrase "all of the ore" meant all of the underground ore not susceptible of shovel mining, and did not include the ore west of the contract plane susceptible of being economically mined by shovel mining operations.

In my opinion the strongest factor in the contentions of the appellee and in the opinion of the trial court supporting its contention is the proposition that the mining operations of the appellant, if conducted as contemplated, would require the cessation of all shovel mining operations before they had been completed as now contemplated. The inference is that the parties could not have intended to prevent the more economical mining by steam shovel where it was possible to so remove the ore, and therefore that the provisions of the contract must be viewed in the light of the presumed intention of both parties to conduct mining operations with the greatest economy possible. However, in this connection it should again be stated that the line of demarkation between the ore removable by the two methods of mining in these claims is not definite and certain and never has been. It can be ascertained definitely only by the actual mining of the ores and by economic conditions at the time of mining. The "shovel mining" operations require the handling of an overburden of material which has to be wasted. It is estimated that shovel operations required the removal of two tons of worthless material for each ton of merchantable ore. If this overburden was unwisely removed at a time when the price of copper was high, then when the price of copper was lower it might be economical to re-

move the exposed ore by shovel mining operations, because two-thirds of the cost of mining the ore, or approximately that, had already been expended. This, as I understand it, is practically what has occurred. Some of the ore west of the contract plane is now relieved of its overburden and therefore can be removed by shovel mining at a relatively less cost than by underground mining. Does this changed condition change the obligations of the contract?

At this juncture we come to one of the most significant features of appellant's claims with relation to the contract: Appellant claims that at the time of the signing of the contract in 1926 the plans of the Nevada Company definitely outlined the shovel mining operations it proposed to conduct in the next five years; that this plan involved the completion of such operations within that period and also preparation by both the Nevada Company and the Coppermines Company during that period for underground operations which should be so far completed at the time pit operations ceased that the flow of ore to the smelter of the Nevada Company should not be decreased and that smelting operations could continue in full swing and that this plan was known to the appellant and provided for in the contract. Appellant admits and asserts that its mining operations in the Champion and Liberty claims will destroy the pit and that the ore removed from block 4-B in those claims by it would cave in the sides of the pit so the pit operations would thereafter become impracticable, but claims that this was exactly what was contemplated by the contract at the time it was entered into. In support of this conclusion the appellant points out that the 1926 plan of operations by the Nevada Company called for the removal by it of 10,000,000 tons of ore by shovel pit operations, and at the time this action was instituted that 10,000,000 tons had already been so removed, and therefore the shovel operations contemplated by the 1926 plan had been completed and that the present difficulty results from a change of plans by the Nevada Company which involves the removal of a larger tonnage by shovel mining. Appellant also points out that the operations proposed by the appellee from its own wedge shaft which was under construction at the time the contract was executed would result in caving in the east side of the pit and prevent further operation therein, at least as early as the Coppermines Company would cave in the western side of the pit by its operations in the Champion and Liberty claims. Appellant's brief states the proposition thus: "The Liberty pit operation was to have been finally and forever concluded, upon the mining of about 11,000,000 tons of so-called shovel ores in the Liberty pit after January 1, 1926. Nevada planned to be mining through the wedge shaft underground in block 2-B in the east end of the Liberty pit at the rate of 8,000 tons per day in the fall of 1927, which within a few months thereafter would have precluded and made impossible any further shovel mining in Liberty pit. It made such representations to Coppermines during the negotiations for the contract and within a few months after it was signed."

This contention seems to be fully supported by the record. In the letter dated December 22, 1926, written by the general manager and engineer of the Nevada Company to J. B. Haffner, superintendent of the Coppermines Company with relation to the shaft it proposed to sink on the Emma Nevada claim in pursuance of its contract obligations, and in particular indicating the desirability of extending the shaft to the 6,470-foot sea level depth, it was stated: "This agreement on station elevations will definitely outline your shaft program for the *next eight months* period, *within which time the Nevada Wedge shaft* will be under full tonnage and the matter of swapping ores to be mined by either company as per the contract can be adjusted with mutual advantage to both companies." (Italics ours.)

In testifying with reference to that letter, he said: "By 'full tonnage' I meant prepared for full tonnage, the shaft, the service equipment and—full tonnage on a three-shift basis, 8,000 tons per day; 8,000 tons in 24 hours or three 8-hour shifts, tramming."

Again he states: "I meant that the Wedge shaft would in eight months be prepared for 8,000 tons a day. We make errors, you know, in letters, in anticipation of conditions. It was not my plan to have the Wedge shaft under full tonnage at that time. I have stated, on direct examination, that I was going to have the Wedge shaft under full tonnage for one shift. That is good business."

He also states that he remembers a conference in September, 1926, between himself and Mr. Smith of the Coppermines Company, and states: "At that time I told them that I intended to go over and mine underground block 2-B *as soon as I could* and that I would be busy in that end of the pit for several years. I said that we would go over to the 2-B block and mine ore in block 2-B and at the same time continue our shovel opera-

tions in the west end of the pit of ore of much lower grade."

He also testified: "In January, 1926, I estimated there were approximately 11,000,000 tons of shovel ore left in Liberty Pit. I am not sure that that estimate was on a .6 cut-off."

He had also testified in a previous condemnation suit between the parties that in his opinion on an .85 cut-off there was in the pit ore body on January 21, 1926, 66,800,000 tons, of which 6,800,000 was pit boundary ore, leaving 60,000,000 tons of recoverable ore on .85 cut-off. Witness testified that .6 cut-off would give 20,000,000 additional tons, so that with the 20,000,000 tons added they would have "80,000,000 tons, less 11,000,000 tons which would come out with the steam shovel with the tenth level."

Nevada map J–166, Defendant's Exhibit F, furnished by Nevada to the Coppermines Company, is said to show that it was the intention of the Nevada to mine underground below the ninth pit level to the bottom of the ore body. Mr. Larsh, testifying concerning it, said: "That copy does not exactly show the ninth level as the level to which underground mining would extend according to that map. That map shows a tonnage in the blocks to the ninth level of the pit and it shows the ninth level too. It shows no shovel toe below that. That ninth level toe is indicated by faint dotted line."

It appears also that it was contemplated that the Ora claims should be mined by underground methods. This mining would also interfere with the further operation of the pit. From this testimony it is a just inference that at the time the contract was made the parties contemplated that pit operations would cease in about five years. The contract in the first preamble declares "that the Nevada now proposes to complete its open pit mining operations as soon as practicable and meanwhile and thereafter purposes to begin underground mining in said pit." Appellant claims that an analysis of paragraph 2 will show that it was contemplated that shovel mining on the Ora and Emma Nevada claims would cease within five years. This paragraph provides for the mining from the Ora claim of a minimum tonnage during the first two years of 400,000 tons. This left an estimated tonnage of 450,000 tons above the tenth pit level, and 250,000 tons below the tenth level (700,000 tons in all) in the Ora claim. As Mr. Lakenan estimated, 200,000 tons per annum mined at the rate of 666 tons per day would require three years and a half

for mining the remaining ore, which, added to two years allowed for mining the first 400,000 tons, makes five and one-half years, or less, depending upon whether or not the production for the first two years exceeded the required minimum.

Appellant says: "Repeatedly are found the significant words 'within five years.' These provisions with respect to the five year period were not haphazardly interjected in Article IV. They are consistent with one another and consistent with the other mining provisions of the contract, i. e., Articles II and III. After the expiration of that five year period the remaining term of the contract is fifteen years. It would take Nevada almost exactly fifteen years to mine the estimated tonnage of 3,400,000 tons at the annual rate of 250,000 tons and under Article IV almost exactly fifteen years for Coppermines to mine the 5,350,000 tons at the minimum rate of 350,000 tons per year. These figures are significant."

The president of the Nevada Company sent a report for the year 1924 to the stockholders in which it was declared, in effect, that shovel mining would be concluded between five and seven years from that date. We quote extensively from that report as giving the viewpoint at that time on that subject:

"It will be necessary, however, to begin, during the year 1925, preparation for mining by underground methods important extensions of or occurrences which surround the ore bodies of the steam shovel pits as at present operated, both laterally and in depth, and which cannot be mined most economically by the open-cut methods, at present employed, because the ratio of worthless overburden to ore becomes so great that the cost of stripping it is relatively prohibitive.

"*While steam shovel operations will continue for at least five to seven years* as the major means of production from the Copper Flat section, it is desirable that underground operations be commenced at an early date on those ores more cheaply recoverable by that method, in order that both types of mining may be employed together in extracting the total ore reserves in a most advantageous and economical way. Present plans contemplate preparations for the production of some underground ore from this area within the next two years, and increasing the rate of such output over several years. The necessary expenditures for equipment and development will, therefore, be spread over four to six years, and will not be seriously burdensome in any one year." (Italics ours.)

This report is confirmed by the 1925 report as follows: "As mentioned in the 1924 annual report, preparation for mining the deep level Copper Flat ores by underground methods is contemplated. * * * The Wedge shaft, mentioned elsewhere in this report, will permit of the gradual exchange from steam shovel mining to underground mining over a period of approximately six years."

It is alleged in the bill of complaint of the appellee herein that in 1925 "Nevada then estimated it would not reach the point in Liberty pit operations where it would become economically desirable wholly or partly to abandon shovel operations until about the summer of the year 1931, and also that it would take until about that time for Nevada to excavate the necessary working shaft and underground haulageways and complete other preparations necessary for underground mining."

Mr. Lakenan, appellee's engineer, testified for the appellee in the condemnation suit between the parties herein in 1926 to the effect that the use of the ore trains and muck trains through the bottleneck of the pit would be entirely eliminated in four years (January, 1930).

The agreement of the Coppermines Company was that it would commence stoping in the Champion and Liberty claims at the contract plane within five years from the date of the contract. This suit was brought to prevent them from so doing, and the decree so provides.

The foregoing considerations lead to the conclusion that at the time the contract was entered into the Nevada Company expected that its shovel operations would be completed within five years, and that by that time its own developments through the wedge shaft for underground mining would be carried to the point where it would be no longer possible to utilize the eastern portion of the pit for shovel mining; that it desired Coppermines Company to be in position then to begin the production of ore from the Champion and Liberty claims of Nevada to supplement its own underground production to the full capacity of its smelters, and consequently required Coppermines to be in a position to begin, and actually begin, its production of ore from these claims at the contract plane within five years from the date of the contract.

Appellant therefore contends that the controversy presented in this case arises from the fact that the Nevada Company changed its plans of development after a change of its mining engineer who increased the proposed scope of its shovel operations. The plan was changed in 1928. This change was partly the result of the threatened destruction of the wedge shaft by the shovel operations of the Nevada Company too close thereto and by its subsequent actual destruction thereby so that the contemplated production of "underground" ore through that shaft is no longer possible. The high price of copper in 1928 throughout the world also modified the economic conditions involved in mining the copper in this deposit.

If it was the intention of the Nevada Company to complete its shovel operations before the time that the Coppermines Company was to begin their underground operations as required by contract, it is clear that no serious objection was made or intended to be made to the mining by the appellant of all the ore west of the contract plane, although such mining would interfere with or prevent shovel mining thereafter in that portion of the pit. So that the inferences which might otherwise arise from a consideration of the question of economical production of ore are fully met by actual plan of the parties with which the language "all the ore in the Champion and Liberty claims," used in the contract, is entirely consistent.

In answer to the appellant's contention that plaintiff intended to cease active shovel operations soon after the completion of its wedge shaft and intended to complete the pit to the ninth level only, or at most the tenth level, and that it afterwards changed its plan to extend its open pit steam shovel operations and indefinitely delay mining by underground methods, the court said: "It is unnecessary, we think, to consider the testimony with respect to whether or no there was a material change in the plan of pit operations as contemplated by the plaintiff at the time of the execution of the contract. Assuming that there was a subsequent substantial change from the then plan of operations, the material question is whether there is anything in the contract limiting the plaintiff in that respect. The contract makes no reference to any limitations with respect to open pit operations. It is clear from the reading of the contract the plaintiff had the right to change its plans from time to time so long as they were not inconsistent with good mining practice. All of the circumstances of the case would seem to support the view that open pit operations would continue so long as that method of mining was more economical. The contract by specific terms places no limit up-

on the depth shovel mining may be extended."

This is true if the contract does give a right to the Nevada Company to mine all "shovel ore" west of the contract plane, but that is the exact question involved in this litigation, and the fact that the Nevada Company has changed its idea as to the proper extent of shovel mining operations tends to explain the proper interpretation of the contract according to the plans in mind when it was executed.

The real question involved is, "Did the parties intend that when the Coppermines Company reached the contract plane five years later it should at once begin mining operations there?" These points are advanced by the appellant to enforce its proposition that the parties intended that all of the ore west of the contract plane was to be mined by the Coppermines Company and that the change of plans is material and important for the reason that the change involves considerations which were not in contemplation of the parties at the time the contract was entered into. It seems to be clear that if, at the time the contract was entered into, it was considered certain that pit operations would cease in about five years, and that time has passed, and that the Coppermines Company would not be in a position to begin mining at the contract plane until about that time, which has arrived, and that the total amount of ore to be shovel mined was estimated to be 11,000,000 tons, which has been already shovel mined, we are now dealing with a problem as to future operations which was not in the minds of the parties at the time they made the definite agreement fixing the time for the beginning of underground mining west of the contract plane by the Coppermines Company. The fact that subsequent changes of plan by the Nevada Company were consistent with good mining practice is wholly irrelevant to the interpretation of the contract. In order to make it relevant, it must be assumed that the parties agreed that their development of the properties should be controlled, not by a definite contract plane marking off the respective ore bodies to be mined by the parties, but by economic considerations consistent with good mining practice. As the appellant asserts in his brief, such a construction of the contract seems wholly inconsistent with the care with which the contract was developed, the ability of the attorneys who drew it and the careful consideration given to it by the experienced officers of both companies who were thoroughly familiar with the mining practice and with

these particular mines and mining claims. As appellant suggests, the contract undoubtedly would have specified some basis for the determination of the relative rights of the parties with reference to mining ore west of the contract plane if it were contemplated that those rights should vary with conditions as they arose from time to time as they did in other portions of the contract where there might be a dispute between the parties on a similar subject.

In addition to the foregoing considerations which appear from the face of the contract and from the undisputed evidence, it appears that, at the time the contract was in process of formation, and shortly before it was actually signed, the officers of the Nevada Company expressed the desire that the word "underground" be incorporated in the article IV to indicate the ore to be mined by the Coppermines Company west of the contract plane. It was particularly suggested by Mr. Jackling, the president of the Nevada Company, to those in charge of the preparation of the contract, on its behalf, that this insertion of this word "underground" was desirable. It was suggested in this correspondence that it was probable that no serious objection would be made by the Coppermines Company to this insertion because of the fact that there are only 500,000 tons of shovel ore west of the contract plane. The testimony as to what occurred when the proposition was advanced by the Nevada Company to the Coppermines Company is stated by Mr. Jenkins who made the proposition to Mr. Cotton, the attorney for the latter company. He testified that he was informed by Mr. Cotton, the attorney who was acting for the Coppermines Company in drafting the contract, that it was entirely unnecessary to make the insertion in the contract, as it was understood between the parties that it was the intention of the contract as drawn to confine Coppermines Company to underground ore. This is flatly denied by Cotton, who testified that on the contrary he refused to make the proposed change by inserting the word "underground" in article IV of the contract, for the reason, he then stated, that it would entirely change the contract. The evidence on behalf of the appellee was adduced for the purpose of securing a reformation of the contract on the ground of mistake or fraud, as prayed for in the bill of complaint. In that regard, in view of this conflict of testimony, it is sufficient to say that the matter was in the mind of the officers of the Nevada Company in connection with the execution of the contract, and the fact that they abandoned

their suggestion that the word "underground" should be incorporated in the contract without seriously pressing the same instead of showing, as the appellee claims, that it was misled by the statements of the attorney representing the appellant indicates, on the contrary, that the matter was considered of no great importance by it and was abandoned. The claim that the Nevada Company was misled by the opinion of the lawyer for the Coppermines Company as to its rights under the proposed contract in a matter deemed by it to be important cannot be seriously entertained. It is impossible to escape the conclusion that this point was then considered of no practical importance in view of the fact that both sides were represented by competent mining engineers and learned attorneys. The fact that the suggestion was made and that the change was not insisted upon, is almost conclusive that the Nevada Company did not then insist nor intend to insist upon its right to shovel mine ore in the Champion and Liberty claims west of the contract plane. I think that the evidence does not justify departing from the plain language of the contract contained in article IV, assuming that such evidence was at all competent to be considered, nor do I think that other provisions of the contract either modify or render ambiguous the clear and express terms of article IV, permitting and requiring the Coppermines Company to mine all the ore west of the contract plane in the Champion and Liberty claims. Assuming, however, that the majority opinion is correct in that regard and that the Nevada Company was to remove the "shovel mining ore" west of the contract plane, I think that the decree is erroneous and should be modified, and I shall now state my reasons for that conclusion.

The decree enjoins the Coppermines Company from removing any ores from the Champion and Liberty mining claims underlying any portion of plaintiff's Liberty Pit "until after plaintiff's shovel mining operations in that portion of said Liberty Pit shall have been fully completed down to the final pit bottom," and from mining by underground or other methods any portion of the Champion or Liberty claim "above the final lowest level to which plaintiff shall elect [sic] to continue its shovel operations in such portion of the Liberty Pit, and from otherwise interfering with plaintiff's right to mine by shovel methods, all ore or other material in the Liberty Pit minable by such methods and lying above the lowest level to which plaintiff shall elect to continue such shovel operations in Liberty Pit."

The court reserved jurisdiction in its decree for the purpose of considering and making in the future any order or direction or modification of the decree or any supplemental decree which it may deem at any time to be proper in relation to the subject-matter in controversy. This decree is in conformity with the theory of the trial court that the parties contemplated from the beginning that all of the ore that could be profitably mined by shovel mining should be so mined. This construction of the contract, however, involves uncertainties which should not be projected into the decree. These uncertainties arise in part from the varying economical conditions which determine the price of copper, which is at present only about one-third its market value at the time the contract was entered into, and also depends upon the wage scale and upon the skill and economy with which the shovel mining operations are conducted, as has been heretofore pointed out. The contract definitely requires the appellant to make preparations for the mining of the ore within five years. To that end it has made expenditures aggregating $2,000,000. The interest on this investment at 5 per cent. would be $100,000 per annum; at 8 per cent., which is the current rate upon investments in Nevada, would be $160,000 per year. In addition thereto, it is required to keep the mine in repair in order that it may subsequently be utilized when permitted by the court. The decree indefinitely postponed the time when the appellant can begin mining the Champion and Liberty claims west of the contract plane, or at the contract plane, without making any provisions to take care of the overhead during the period of delay caused by the shovel operations of the Nevada Company, although the contract required the Coppermines Company to be prepared to begin mining operations at the contract plane no later than July 23, 1931. The period of delay is not fixed by the decree in any fashion, but evidently left to the further order of the court to be fixed with reference to future and changing economic conditions. It seems to me that the decree at least should be definite and certain, and that the court should have determined at the time of trial the amount of ore which should be mined by shovel mining method west of the contract plane in the claims in question, and should have fixed a time during which the shovel mining operations could continue and a date at which they must cease. The evidence on the subject was abundant, and the trial judge at the time of the trial knew as much more about the conditions of the mine and its eco-

nomical development than the parties themselves knew at the time the contract was entered into as had been developed by five years of extensive mining and by a shift of economic conditions from high prosperity to great depression. The Nevada should not have the advantage of all these changes without some corresponding compensation to the Coppermines Company. He who seeks equity should do equity, is still a maxim in equity, although not at this day applicable at law. The Nevada Company seeks to reap all the economic advantages due to changes without compensating the Coppermines Company for a loss due to complying with its agreement to be prepared to begin mining at the contract plane in 1931. It is true that the court found as a fact that there are other ores in the other claims of the appellant which can be developed from the Emma Nevada shaft constructed under the contract as aforesaid, thus without interfering with the pit operations, utilizing the capital investment. The trial court evidently felt that this would enable the appellant to fully utilize the capital investment it had made, and because of that there was no necessity for making any provision for compensation for the Coppermines Company's outlay. These claims are strenuously urged by the appellant, and I think are not satisfactorily met by the suggestion that they can mine from other claims and thus utilize their $2,000,000 capital investment. The trial court held [44 F. (2d) 192, sub. 12], that it was clear from the written contract that the defendant had no right to prosecute mining by underground methods at the contract plane, or westerly thereof, beneath the surface of the Liberty pit prior to the completion by the plaintiff of the open pit mining operations.

I can see no justification for the order of the court retaining jurisdiction to consider the matter as it might develop in the future. It leaves the matter entirely in the air, and virtually puts the judge in the mining business to act as arbitrator over future controversies. The District Court should have definitely fixed the rights of the parties by the decree. It should have fixed the time when shovel mining should cease west of the contract plane, and correspondingly the time when the appellant is entitled to begin its underground operations at that plane. The decree should not leave the matter to the ever shifting plans of Nevada Company to be acquiesced in by Coppermines Company or to be determined by the court from time to time as objection might be made by it thereto. In conclusion:

First. I am of the opinion that the contract should be construed according to its express terms, giving the mining of all ore west of the contract plane and along that boundary to the Coppermines Company; that, if the effect of this operation would be to destroy the pit before it is economically desired to do so, the parties be left to work out this problem by a subsequent agreement by which appropriate and mutual concessions can be made in view of the newly ascertained facts.

Second. Assuming that the trial court is right in its interpretation of the contract, I think the decree should be reversed, with instructions to the trial court to fix a definite time within which shovel mining operations shall be completed, and the amount of the ore that may be removed thereby. This, no doubt, can be done from the evidence already submitted, or by the evidence of competent mining engineers, or, in default thereof, an arbitrary date can be and should be fixed.

Third. One of the difficulties inherent in this case is the present low price of copper, and the fact that there is practically no copper market. This may make the course of the trial court a wise one, in the interests of both parties, as it practically stops mining during the period of low prices, but in so doing it gives an advantage to the Nevada Company, because Nevada's ore was to be mined by Coppermines Company without regard to the present depression and its compensation at 16 cents per ton is the same no matter what the copper content of the ore may be or what the price of copper may be, but I think that these considerations do not justify the interposition of a court of equity or its continued or continuous interference.